**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **DANIEL LEWIS LEE** | : | |
| **Register Number 21303-009** | : | |
| **U.S. Penitentiary Terre Haute** | : | |
| **Terre Haute, IN 47802** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No. _____** |
| | : | |
| **WILLIAM P. BARR** | : | **CAPITAL CASE** |
| **Attorney General** | : | |
| **U.S. Department of Justice** | : | **EXECUTION SCHEDULED FOR** |
| **950 Pennsylvania Avenue, NW** | : | **DECEMBER 9, 2019 AT 8:00AM EST** |
| **Washington, DC 20530;** | : | |
| | : | |
| **JEFFREY A. ROSEN** | : | |
| **Deputy Attorney General** | : | |
| **U.S. Department of Justice** | : | |
| **950 Pennsylvania Avenue, NW** | : | |
| **Washington, DC 20530;** | : | |
| | : | |
| **ROSALIND SARGENT-BURNS** | : | |
| **Acting Pardon Attorney** | : | |
| **Office of the Pardon Attorney** | : | |
| **950 Pennsylvania Avenue, NW** | : | |
| **Washington, DC 20530;** | : | |
| | : | |
| **KATHLEEN HAWK SAWYER** | : | |
| **Director** | : | |
| **Federal Bureau of Prisons** | : | |
| **U.S. Department of Justice** | : | |
| **320 First St., NW** | : | |
| **Washington, DC 20534;** | : | |
| | : | |
| **JEFFREY E. KRUEGER** | : | |
| **Regional Director** | : | |
| **Federal Bureau of Prisons** | : | |
| **North Central Region** | : | |
| **U.S. Department of Justice** | : | |
| **400 State Avenue, Suite 800** | : | |
| **Kansas City, KS 66101;** | : | |
| | : | |

1

and                                        :
                                           :
T.J. WATSON                                :
Complex Warden                             :
U.S. Penitentiary Terre Haute              :
4700 Bureau Road South                     :
Terre Haute, IN 47802,                     :
                                           :
In their official capacities; and,         :
                                           :
U.S. Department of Justice                 :
950 Pennsylvania Avenue, NW                :
Washington, DC 20530                       :
                                           :
Federal Bureau of Prisons                  :
U.S. Department of Justice                 :
320 First St., NW                          :
Washington, DC 20534                       :
                                           :
Office of the Pardon Attorney              :
950 Pennsylvania Avenue, NW                :
Washington, DC 20530;                      :
                                           :
        Defendants.                        :

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF THE FIRST AND FIFTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

### I.
### Nature of Action

1.      Plaintiff Daniel Lewis Lee ("Mr. Lee") brings this action for injunctive and declaratory

relief for violations of: (i) his right to due process under the Fifth Amendment to the U.S.

Constitution, which have arisen in the course of his attempt to make use of mandatory

procedures created for individuals under a federal death sentence seeking executive clemency;

and (ii) the right to free speech under the First Amendment to the U.S. Constitution, on behalf of

correctional officers who have been barred, due to Defendants' actions and policies, from

providing critical information in support of Mr. Lee's pending petition for executive clemency.

2

## II.
## Parties

2.    Plaintiff Lee is a U.S. citizen and he is incarcerated at the United States Penitentiary in Terre Haute, Indiana ("USP Terre Haute"). He is a death-sentenced prisoner under the control and supervision of the Federal Bureau of Prisons ("BOP"), an agency within the U.S. Department of Justice ("DOJ"). He was scheduled for execution by lethal injection at the United States Penitentiary in Terre Haute, Indiana on December 9, 2019. That execution has been enjoined by this Court in a separate proceeding.[1]

3.    Defendant William P. Barr is the Attorney General of the United States. Mr. Lee was remanded into the Attorney General's custody upon Lee's conviction and the imposition of his death sentence. Attorney General Barr oversees the BOP and the Office of the Pardon Attorney. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

4.    Defendant Jeffrey A. Rosen is the Deputy Attorney General of the United States. Under the supervision of the Attorney General, he oversees the day-to-day operations of the BOP and the Office of the Pardon Attorney. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

---

[1] *See* Order Granting Motion for Preliminary Injunction, *In re In The Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-145, Dkt. 51 (D. D.C. Nov. 20, 2019). The Government appealed that decision to the United States Court of Appeals for the District of Columbia Circuit, indicating its intent to seek relief in the U.S. Supreme Court if a ruling was not entered by December 2, 2019. *See id.,* Dkt. 52; *see also,* Appellants' Emergency Motion to Stay or Vacate Preliminary Injunction, *In re In The Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-5322, Doc. 1817384 (D.C. Cir. Nov. 25, 2019). A panel of the Court of Appeals entered an order denying the Government's motion on December 2. *See* Order, *In re In The Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-5322, Doc. 1818236 (D.C. Cir. Dec. 2, 2019). It is counsel's understanding as of the time of this filing that the Government will be challenging the injunction in the Supreme Court imminently.

5. Defendant Rosalind Sargent-Burns is the Acting Pardon Attorney. She is charged with managing the day-to-day operations of the Office of the Pardon Attorney, including oversight of the review and investigation of clemency petitions and making recommendations on petitions, pursuant to the clemency process, to the Deputy Attorney General and Attorney General. She is sued here in her official capacity for the purpose of obtaining declaratory and injunctive relief.

6. Defendant Kathleen Hawk Sawyer is the Director of the BOP. She oversees the operations of BOP facilities, staff, and individuals in BOP custody, and serves the Deputy Attorney General and Attorney General. She is sued here in her official capacity for the purpose of obtaining declaratory and injunctive relief.

7. Defendant Jeffrey E. Krueger is the Regional Director of the North Central Region of the BOP. As such, he has the responsibility for USP Terre Haute, and he plays a critical role in the oversight of the operations of that prison, including policy implementation. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

8. Defendant T.J. Watson is the Complex Warden of USP Terre Haute, which is where Mr. Lee is confined. In that position, he is charged with management of USP Terre Haute and the oversight and implementation of operations and policies there. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

9. Defendant DOJ is a cabinet-level department of the federal government responsible for enforcement of the laws of the United States, for oversight and implementation of procedures relating to executive clemency, and for oversight of the BOP and implementation of BOP policies.

10. Defendant Office of the Pardon Attorney is an office within the DOJ responsible for reviewing, investigating, and making favorable or unfavorable recommendations regarding petitions for executive clemency.

11.     Defendant BOP is a sub-agency of the DOJ responsible for the care, custody, and control of individuals incarcerated by the Federal Government.

12.     Defendants are acting, and each of them at all times relevant hereto were acting, in their respective official capacities with respect to all acts described herein, and were in each instance acting under the color and authority of federal law in violating Mr. Lee's constitutional rights and the constitutional rights of BOP employees—USP Terre Haute correctional officers—seeking to provide critical information in support his clemency petition. Upon information and belief, unless preliminarily and permanently enjoined, each of the Defendants intends to act in his or her official capacity and under the authority of federal law in violating Mr. Lee's constitutional rights.

**III.**
**Jurisdiction and Venue**

13.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 2201 in that the claim for injunctive relief arises under the United States Constitution and federal statutes, including 5 U.S.C. § 702 which waives sovereign immunity for an action seeking relief other than monetary damages against an agency. The request for declaratory relief is based on 28 U.S.C. § 2201, in that an actual controversy exists between Defendants and Mr. Lee involving actions taken by the Defendants and policies applied by Defendants to Mr. Lee in violation of rights guaranteed by the United States Constitution. Defendants have obstructed Mr. Lee's ability to support his clemency petition with first-hand evidence from USP Terre Haute corrections personnel, including that which powerfully and directly refutes false claims the prosecution made in seeking a death sentence that he posed a continuing threat of violence in prison.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1) because the DOJ, Office of the Pardon Attorney, and BOP headquarters are in this district; because a

substantial part of the events giving rise to the claims made by Mr. Lee—including Defendants'

actions pertaining to the executive clemency process in Mr. Lee's case—took place and continue

to take place in this District; and because Defendants, the majority of whom reside in this

District, were acting in their official capacities in violating Mr. Lee's and the USP Terre Haute

correctional officers' constitutional rights.

## IV.
## Factual Background

**A.    Factual Allegations Pertaining to the Investigation and Preparation of Mr. Lee's Clemency Petition.**

15.    On July 25, 2019, Defendant DOJ and Defendant Attorney General Barr announced in a

press release that Plaintiff Lee had been selected to be executed by lethal injection pursuant to a

new protocol, and Defendant BOP was directed to set the date.[2] Mr. Lee was scheduled for

execution December 9, 2019, the first of five men to be executed in a span of five weeks, and the

first federal execution in over sixteen years.[3]

16.    Upon receiving notification of the scheduled execution, counsel for Mr. Lee began to

prepare for capital clemency proceedings on his behalf, and on August 30, 2019, Mr. Lee,

consistent with the requirements of 28 C.F.R. § 1.10 ("Procedures Applicable to Prisoners Under

a Sentence of Death Imposed by a United States Court"), filed a formal petition for commutation

of his death sentence, addressed to the President of the United States, with the Office of the

---

[2] *See* Press Release, U.S. Department of Justice, Federal Government to Resume Capital Punishment After Nearly Two Decade Lapse (July 25, 2019), available at https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse (last visited Dec. 2, 2019); *see also* Notice of Adoption of Revised Protocol, *Roane v. Barr*, Civ. No. 05-2337, (D. D.C. July 25, 2019), Dkt. 385 (notifying plaintiffs in ongoing litigation challenging federal lethal injection protocol of revised protocol).

[3] *Id.*

Pardon Attorney in the DOJ. *See* 28.C.F.R. §§ 1.1, 1.10(b). Also consistent with these procedures, supplemental materials in support of the petition were submitted by September 13, 2019, and the Office of the Pardon Attorney scheduled an in-person meeting with Mr. Lee's counsel where evidence was presented on October 23, 2019. *Id.*

17.     Mr. Lee's petition for commutation of his death sentence is largely premised on two grounds. First, the victims' survivors, the judge who presided at trial and sentenced Mr. Lee to death, and the lead trial prosecutor, all oppose his execution—an extraordinary and rare, if not unprecedented, alignment of such views in a capital case. Second, the prosecution's misleading claim at the penalty phase of Mr. Lee's trial that he should be sentenced to death because he would otherwise pose a continuing threat of violent behavior in prison was then and remains today untrue; and that false and unreliable evidence about Mr. Lee posing a "future danger" led to a disparate, unjust outcome where he was sentenced to death but his far more culpable co-defendant Chevie Kehoe's life was spared.

18.     The prosecution's misleading claims about Mr. Lee's so-called "future dangerousness"—which provide the basis for this latter ground for clemency—were two-fold. First, it introduced false and inflammatory evidence that he was a "psychopath" as measured by a forensic instrument that has no place in a capital prosecution. The Government itself has quietly ceased using the instrument—Psychopathy Checklist-Revised (PCL-R)—to prove "future dangerousness" in capital cases.[4] Second, the prosecution suppressed information favorable to

---

[4] Of the 62 people currently on federal death row, Mr. Lee is the *only one* whose capital sentencing proceedings relied on aggravating evidence of future dangerousness based on the PCL-R and so-called "psychopathy" evidence. *See* Federal Capital Habeas Project, *Growth in Federal Death Row Population*, available at https://2255.capdefnet.org/General-Statistics/Growth-Federal-Death-Row-Population (last visited Dec. 2, 2019) (showing total number of individuals on federal death row). In every other federal capital case involving such evidence, the courts have either been able to reverse the judgment or precluded the evidence

Mr. Lee and presented false testimony at sentencing about his prior involvement as a youth in a murder in Oklahoma, for which he allegedly escaped culpability, in an effort to persuade jurors he fit the profile of a "psychopath" consistent with its PCL-R testing results. Although the Government argued he was given a "gift" by the prosecutors in the Oklahoma case for letting him get away with murder, in fact, they did not even have the option of charging him with a homicide; rather, the presiding judge determined that the evidence against him was legally insufficient to establish probable cause for murder.

19.    In support of this latter ground for clemency about the prosecution's misleading claims, Mr. Lee has submitted to the Office of the Pardon Attorney records from mental health providers who observed him as a youth, as well as declarations from individuals who knew him prior to his arrest in the capital proceeding,  in an effort to debunk the bases for the alleged aggravating factor that Mr. Lee would be a future danger in prison; and he has provided a declaration from one of the jurors who sentenced him stating that although this juror was reluctant to believe Mr. Lee would pose a continuing threat of violence, the prosecution's presentation about him escaping culpability for the prior murder was important to the jury as a whole and ultimately swayed this juror's vote.

### 1.    The Material Evidence Mr. Lee Sought to Obtain

20.    As part of the preparation of his clemency petition, one of Mr. Lee's attorneys, George Kouros, communicated with a member of the correctional staff employed by Defendant BOP— an officer assigned for many years to the Special Confinement Unit (SCU),[5] where all men under

---

from ever being presented to the jury in the first place.

[5] The Special Confinement Unit (SCU) at USP Terre Haute is, as its name suggests, a special unit designed for inmates with "maximum custody" classification and enhanced security measures implemented by specially trained staff.

federal death sentence are held—who has provided a first-hand account; detailed information; and his own professional and personal opinions about Mr. Lee relating to the alleged "future dangerousness" aggravating factor, his character, and his behavior, among other issues. The correctional official provides important information and a unique perspective that—along with the views of the victims' family members, trial judge, and trial prosecutor—strengthens his case for having his sentence commuted. The correctional official's account and opinions also powerfully and directly refute the claim that Mr. Lee presents a continuing threat of violence. This information was based on the correctional official's close interactions with and observations of Mr. Lee in a federal correctional institutional setting over a period of almost twenty years. He has further indicated several other USP Terre Haute staff members' interest in providing similar accounts, information, and opinions.

21.     The names of this correctional staff member and others are not disclosed in the Complaint in order to protect their identities in light of expressed concerns about Defendants, supervisors, and co-workers subjecting them to threats, reprisals, discipline, demotions, unwanted transfers, and/or other potential job-related harms for providing information in support of Mr. Lee's application for commutation.

22.     In August 2019, this member of the correctional staff at USP Terre Haute conveyed to Mr. Kouros details about his experience with Lee that are critically important to the clemency application. He explained to Mr. Kouros that he had gotten to know Mr. Lee well over the many years he had worked in the SCU, that Mr. Lee was a model inmate, and that Mr. Lee had always treated him with respect. He further stated that while some inmates cause disciplinary problems and cannot be controlled easily, Mr. Lee was not among these in that he was easy to manage and

never gave him problems. He added that people are capable of change in prison, that they can be educated and better themselves, and that Mr. Lee was a good example of that.

23.     This member of the USP Terre Haute correctional staff explained to Mr. Kouros during the aforementioned communications that he was aware of how Mr. Lee had been portrayed in the media, as a violent white supremacist, and that this was not in fact an accurate portrayal. According to him, Mr. Lee was an easy inmate to supervise, was well-liked by other inmates and other staff in the SCU, and got along with everyone, including non-white prisoners and staff. He added that most people unfamiliar with prisons make assumptions that all inmates are dangerous and uncontrollable, but that he has a perspective on the SCU population that is based on actually having worked there for years and on getting to observe and interact with the inmates on a daily basis. He conveyed to Mr. Kouros that based on his experience, and on his knowing Mr. Lee for years, it was his opinion that Mr. Lee was not violent or dangerous, and that Mr. Lee was a "poster boy" for how an inmate could turn his life around in prison.

24.     This member of the correctional staff further expressed during the aforementioned communications that Mr. Kouros should know that Mr. Lee had been given an orderly job in the SCU, and this said something in and of itself about how the correctional staff view Lee—he was trusted enough to be given that position because it meant periods of less restrictive conditions of confinement and supervision while performing his orderly job duties.

25.     This member of the correctional staff further conveyed to Mr. Kouros during the aforementioned communications that in his experience, many of the men who go to prison do not come from stable homes and that the correctional officers who interact with them daily sometimes play a "father figure" or mentor role, teaching them how to grow and mature into

10

men. He described Mr. Lee as "a man now" and that he accordingly treated the staff and other inmates with respect.

26.     Finally, this member of the correctional staff informed Mr. Kouros during the aforementioned communications that he was aware of other staff members, including at least one ranking officer, who were interested in providing similar statements supporting Mr. Lee's clemency petition, but that he had been warned that the legal department had to first provide authorization for him and the others to provide such statements.

> **2.      Defendants' Deliberate Interference with Mr. Lee's Ability to Obtain and Present Material Evidence in the Clemency Process, and Infringement on Correctional Staff Members' Right to Provide Information in Support of his Clemency Application.**

27.     Following these communications, the same correctional staff member in late August informed Mr. Lee's counsel that approval was required for him to provide a statement in connection with his clemency application. Mr. Lee's counsel then promptly contacted the USP Terre Haute legal department in writing, requesting permission for members of the correctional staff to provide formal, sworn statements in support of Mr. Lee's petition for executive clemency. On September 6, 2019 an attorney from the legal department, Katherine Siereveld, by email informed Mr. Lee's counsel that in order to grant the request, she would have to "run this up the chain." On the same day, Mr. Lee's counsel wrote an email back to Ms. Siereveld, stressing the importance of a timely response on the request from the legal department, due to a then-fast approaching deadline for submission of materials to the Office of the Pardon Attorney in support of the clemency petition.

28.     On September 9, 2019 counsel for Mr. Lee sent another email to Ms. Siereveld seeking an answer regarding the request to collect statements from correctional staff. Ms. Siereveld responded that she had been attempting to see who could authorize the request and whether it

could be authorized "outside of the official progress report[s]," stating the request may fall under BOP Program Statement 5840.04, which apparently requires authorization for staff to "release official information or directly correspond with outside agencies or persons" about inmates' "background," "institutional behavior," or "progress." The same day, counsel for Mr. Lee followed up for clarity about what position Ms. Siereveld was taking on the matter, and she responded that she was still working on getting an answer.

29.     In response to a September 11, 2019 email from counsel for Mr. Lee seeking an update on the status of the request, Ms. Siereveld sent an email the following day, this time pointing to 28 C.F.R. § 571.41, a regulation pertaining to the BOP's sharing of general information with inmates about how to initiate the clemency process and the Office of the Pardon Attorney's procedures for obtaining recommendations from the Director of the BOP on clemency petitions, which was not relevant to Mr. Lee's interest in obtaining and presenting information and/or statements from correctional staff in support of his clemency petition to decision-makers. When Mr. Lee's counsel pressed for clarity on Defendant BOP's position regarding his request, Ms. Siereveld sent another email making clear that no staff member would be allowed to "offer opinions on Mr. Lee's clemency petition."

30.     Pursuant to 28 C.F.R. § 1.10(c), on October 23, 2019, at the Office of the Pardon Attorney, DOJ, in Washington D.C., counsel for Mr. Lee made a presentation and submitted evidence in support of his clemency petition to the presiding officials. During the proceeding, these officials, after making clear that they had reviewed parts of his trial record and BOP files, including his disciplinary records, asked counsel several pointed questions specifically about Mr. Lee's record at USP Terre Haute, his behavior there, his propensity for violence, with whom he associates, and his adjustment to prison and what kind of person he is today, among others. In

response to the officials' questions, counsel for Mr. Lee explained that they did not have access to much of the detailed information necessary to answer the questions posed, but felt strongly that, if they did, Mr. Lee would be reflected in a positive light.[6]

31.     Counsel were, as a result of Defendants' actions and policies, unable to present a full measure of support for Mr. Lee's petition in the clemency process—namely, supporting declarations or other evidence from USP Terre Haute correctional personnel who interacted with him on a daily basis in a prison setting. These would have addressed what were clearly issues of serious concern for the officials about Mr. Lee's alleged "future dangerousness" as well as provided up-to-date information from Government sources about how Daniel Lee has changed in prison and who he actually is.

32.     Members of the USP Terre Haute correctional staff continue to possess highly relevant information that directly refutes the "future dangerousness" aggravator on which Mr. Lee's death sentence is based, and provides other facts contrary to representations made about him, but are being prevented from providing it in the clemency process. Because of Defendants' actions and policies, Mr. Lee is being deprived of his rights to meaningful access to that process, and the correctional staff who wish to share critical information supporting him in that process are being deprived of their right to do so.

**B.     Factual Allegations Pertaining to the Process for Individuals Under Death Sentence.**

33.     The sole procedures for a person under a federal death sentence to petition the President of the United States for commutation are set forth in the Code of Federal Regulations, 28 C.F.R. § 1.1-1.10, with § 1.10 specifically governing the process petitioners must follow in capital

---

[6] Mr. Lee presents these questions and answers to the best of his recollection. Although the Office of the Pardon Attorney had a stenographer present, he was told that a transcript would be made for DOJ alone and that he would not have access to it despite his request.

cases. 28 C.F.R. § 1.10 was promulgated on August 2, 2000, in advance of what were then the first executions to be carried out by the Federal Government since the U.S. Supreme Court's decision in *Furman v. Georgia*, 92 S.Ct. 2726 (1972). The procedures applicable to persons under death sentence, among other requirements, set a strict deadline for the time for filing a clemency petition, and for submitting supplemental materials in support of the petition, to the Office of the Pardon Attorney in the DOJ; they describe the process—and only avenue—for the petitioner to present testimony and other materials in support of his petition to the Office of the Pardon Attorney, and the process—and only avenue—for the victims of an offense to provide their position on the petition. *See* 28 C.F.R. § 1.10.

34.     In addition to the mandatory procedures specifically applicable to persons under a death sentence seeking commutation, 28 C.F.R. §§ 1.1-1.11 set forth formal regulations that must be followed by anyone petitioning the President for relief in the form of executive clemency or pardon. Among them are regulations requiring submission of any petition for such relief to the Office of the Pardon Attorney, although petitions are to be addressed to the President, and requiring certain information be included in the petition; regulations describing the role of the Attorney General in investigating cases in which clemency relief is sought with assistance from agencies, such as the Federal Bureau of Investigations, in determining issues about disclosure of files and contacting victims, and in recommending favorable action by the President; regulations that permit the Attorney General to delegate duties related to the clemency process to others within DOJ, including the Office of the Pardon Attorney; and those that describe the process for notifications of grants and denials of petitions. *See* 28 C.F.R. § 1.1-1.11.

35.     The President's authority to grant pardons and reprieves and to commute sentences derives from Article II, Section 2, Clause 1[7] of the U.S. Constitution; however, mandatory procedures have been developed over the course of the last two centuries, in tandem with the growth of the administrative state, for petitioners, including members of the general public requesting pardon as well as prisoners in custody requesting commutation, to seek and potentially obtain such relief.

36.     In the early years of the Republic, the President relied directly on the advice of the Secretary of State and the Attorney General for reviewing petitions and exercising his pardon and clemency powers; by 1858, the review of petitions was transferred to the Attorney General while the issuing of warrants granting relief remained in the State Department's purview.[8] In 1865, Congress authorized the Attorney General to employ a pardon clerk to assist with the handling of petitions.[9]

37.     As the federal justice system grew in size and complexity, the U.S. Department of Justice was created, and the Office of Clerk of Pardons became part of it.[10] By 1887, the early iterations of a more formal process for members of the public seeking pardon and those in custody seeking

---

[7] Article II, Section 2, Clause 1 in relevant part states: "The President…shall have power to grant reprieves and pardons for offenses against the United States except in cases of impeachment."

[8] *See* Homer Cummings & Carl McFarland, <u>Federal Justice: Chapters in the History of Justice and the Federal Executive</u> 149 (1937).

[9] *See* 13 Stat. 516 (authorizing Attorney General to employ one "pardon clerk").

[10]  *See* 16 Stat. 162 (establishing U.S. Department of Justice); *see also*, Records of the Office of the Pardon Attorney, National Archives (Record Group 204), 1846-1965 (noting "The Office of the Clerk of Pardons became a component of the newly created Department of Justice, pursuant to its enabling act, June 22, 1870 (16 Stat. 162), available at https://www.archives.gov/research/guide-fed-records/groups/204.html (last visited Dec. 2, 2019).

commutation to follow, and the rules for administrative officials to handle pardon and clemency

petitions, began to take shape:  according to the "Pardon Bureau" in the DOJ's Report to a Select

Committee of the Senate, dated April 1887, for example, "Every application for pardon

addressed to the President is referred to the Attorney General, and by him to the clerk of pardons

for his prompt and appropriate attention;"[11] the Pardon Bureau further reported then that the

Clerk of Pardons was directed to solicit the views of the U.S. Attorney and, if practicable, the

views of the district judge, and to keep records of the progress of applications "at every stage of

these proceedings," as part of the process for determining whether to make a favorable

recommendation to the President.[12] At the time, the Clerk of Pardons, according to the same

Report to the Senate, was overwhelmed by the growing number of petitions and the volume of

duties placed upon him, especially in connection with his ability to manage correspondence with

members of the public, and made clear to Congress the need for additional staff to assist him.[13]

38.     In 1891, the Office of the Clerk of Pardons was superseded by the Office of the Attorney

in Charge of Pardons, established in the DOJ pursuant to an act of Congress;[14] and, in 1893, by

Executive Order, the reviewing, investigating, and issuing of all warrants in connection with

petitions for commutation and pardons was consolidated within the DOJ.[15] The Office of the

---

[11] *See* Alex R. Boteler, Clerk of Pardons, Report of Pardon Bureau, U.S. Department of Justice Report to Select Committee of the Senate, April 1887.

[12] *Id.*

[13] *Id.*

[14] *See* 26 Stat. 946; *see also*, Records of the Office of the Pardon Attorney, National Archives (Record Group 204), 1846-1965, available at https://www.archives.gov/research/guide-fed-records/groups/204.html (last visited Dec. 2, 2019).

[15] *See* Exec. Order (June 16, 1893) (stating "I hereby direct that all warrants of pardon and commutation of sentence, heretofore prepared at the Department of State on the requisition of the

16

Attorney in Charge of Pardons was redesignated the Office of the Pardon Attorney, as it is known today, in 1894.[16]

39.    The first formal clemency rules were approved by President McKinley in 1898 and contained a few of the features of the modern day regulations pursuant to 28 C.F.R. § 1.1-1.11: for example, the rules directed members of the public and those in custody applying for such relief to address a petition to the President and forward it to the Attorney General; and, they set out the process for soliciting views of the U.S. Attorney and trial judge, including in capital cases, and the effect of those opinions on the Office of the Pardon Attorney's favorable treatment of the petition.

40.    Between 1898 and 1962, the formal clemency rules underwent occasional revisions, some of which appear in the modern day regulations—for example, the 1924 rules introduced the designated form to be submitted by members of the public and those in custody; and were adapted based on the expansion of the Republic,[17] and in light of the growing number of individuals incarcerated in federal prisons or on parole,[18] or those subject to prosecution under

---

Attorney General, be prepared and recorded in the Department of Justice under the seal of that Department and countersigned by the Attorney-General").

[16] *See* Records of the Office of the Pardon Attorney, National Archives (Record Group 204), 1846-1965, available at https://www.archives.gov/research/guide-fed-records/groups/204.html (last visited Dec. 2, 2019).

[17] *See* "Rules Relating to Application for Pardon," Department of Justice, Feb. 12, 1924 (noting special rules for petitioners from "Puerto Rico, Hawaii, Virgin Islands, and the Canal Zone…").

[18] *See id.* (noting "Applications for Executive clemency will not be considered until after the person convicted has served some portion of his sentence (nor ordinarily, until the prisoner has reached his parole period and been denied parole) except upon a substantial showing of innocence or some other exceptional circumstance, developed since the trial, which clearly justifies an extension of Executive clemency."); *see also,* 46 Stat. 325 (pursuant to 1930 Act of Congress, Bureau of Prisons was established within DOJ).

federal "Immigration, Narcotic, Naturalization, Postal, or Prohibition Laws."[19] The Federal Bureau of Investigations was first assigned a formal role in investigating the "record and conduct" of petitioners in 1946.[20]

41.    In 1962, the "Rules Governing Petitions for Executive Clemency" took on their modern day form and structure, and were for the first time formally published for the public in the Federal Register, which contains agency rules, proposed rules, public notices, administrative orders, and executive orders: "These regulations shall become effective on the thirty-first day following the date of their publication in the Federal Register."[21] The 1962 regulations remained in place until 1983, when two additions to the regulations were made and published in the Federal Register, 28 C.F.R. §§ 1.1-1.10;[22] and they were amended in 1993 to include a provision for notifying individuals under death sentence about the disposition of their petitions.[23]

42.    As noted previously, the regulations setting forth special procedures applicable to petitioners under federal death sentence like Mr. Lee, codified at § 1.10, went into effect in August 2000 and remain in place today.

43.    What was once an informal, ad hoc undertaking involving the President and a few of his closest advisors has developed into a modern day system operating with the hallmarks of the

---

[19] *See id.*

[20] *See* "Rules Governing Petitions for Executive Clemency," Department of Justice, Jan. 19, 1946; *see also* 28 C.F.R. § 1.6(a).

[21] *See* "Rules Governing Petitions for Executive Clemency," Department of Justice, Oct. 30, 1962.

[22] *See* "Rules Governing Petitions for Executive Clemency," Department of Justice, May 5, 1983

[23] *See* "Rules Governing Petitions for Executive Clemency," Department of Justice, Oct. 12, 1993.

administrative state—duties related to the handling, investigation, and consideration of clemency petitions, for example, have by and large been delegated to career officials in the Office of the Pardon Attorney and other agencies within the DOJ bureaucracy, situated well downstream from the President; and formal agency regulations have been promulgated for the general public and these administrative officials to follow. Countless persons seeking justice through the different forms of clemency relief, including those potentially eligible for pardon, the almost two hundred thousand in federal custody,[24] and the sixty-two under federal death sentence,[25] who have no direct line to the President, are by legislative and executive branch design steered to and dependent on this firmly rooted administrative system.

44.     It is against this backdrop that Mr. Lee has sought to utilize the formal procedures specifically developed for prisoners under a death sentence to pursue executive clemency. It is in the course of attempting to follow the requirements of this process—for seeking, through the Office of the Pardon Attorney, a favorable recommendation on his petition to the President—that he has encountered 1) the Defendants' obstruction of his ability to gather and present critical, material evidence, which refutes the case against him and exposes the lie on which his death sentence is based; and, 2) the Defendants' infringement on correctional officers' ability to support his efforts in that process. He has no adequate remedy at law for these constitutional violations. And both he and those officers uniquely positioned to support him will suffer irreparable injury unless appropriate equitable relief is provided by the Court.

---

[24] *See* U.S. DEP'T OF JUSTICE, OFFICE OF JUSTICE PROGRAMS, BUREAU OF JUSTICE STATISTICS, PRISONERS IN 2017 (April 2019), available at https://www.bjs.gov/content/pub/pdf/p17.pdf (last visited Dec. 2, 2019).

[25] Federal Capital Habeas Project, *Growth in Federal Death Row Population*, available at https://2255.capdefnet.org/General-Statistics/Growth-Federal-Death-Row-Population (last visited Dec. 2, 2019)

**V.**
**<u>Claims for Relief</u>**

**A. Deprivation of Fifth Amendment Right to Due Process—Defendants' Deliberate Interference with Mr. Lee's Ability to Obtain and Present Material Evidence from BOP Correctional Officers in Support of his Pending Petition for Clemency.**

45.    Mr. Lee re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

46.    The Due Process Clause of the Fifth Amendment prohibits the Government from deliberately interfering with a witness's ability to speak with the representatives of a criminal defendant. *See, e.g., Gregory v. United States*, 369 F.2d 185, 187-89 (D.C. Cir. 1966). These protections afforded to Mr. Lee extend beyond the trial proceeding. *See, e.g., Blackledge v. Perry*, 417 U.S. 21 (1974) (due process prohibits prosecutorial retaliation for defendant's decision to seek retrial). Importantly, the protections of the Due Process Clause apply to capital clemency proceedings like Mr. Lee's, and the Government is prohibited from arbitrarily or perniciously denying a death-sentenced prisoner access to its clemency process. *See Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 288-89 (1988) (O'Connor, J., concurring); *see also, Young v. Hayes*, 218 F.3d 850, 853 (8th Cir. 2000) (granting stay of execution and remanding case with looming execution date in light of state actor's deliberate interference with petitioner's ability to present evidence to Governor in support of clemency petition, which violated Due Process protections).

47.    Defendants' actions and policies obstructing Mr. Lee's ability to gather and present favorable, material evidence from USP Terre Haute correctional staff members which directly refutes his alleged "future dangerousness" have deprived him of a meaningful opportunity to utilize procedures that he must comply with to pursue executive clemency relief. As demonstrated by the questions posed to Mr. Lee's counsel by officials in the Office of the Pardon

20

Attorney—officials tasked with reviewing, investigating and deciding whether to make a favorable recommendation on his petition—falsehoods about his propensity for violence both matter to key decision-makers in the clemency process and persist unchallenged as a direct result of Defendants' deliberate interference in that process.

48.    These actions and policies have further interfered with Mr. Lee's ability to gather and present other evidence highly relevant to his petition for commutation.

49.    By the actions and policies described above, the Defendants have violated and deprived Mr. Lee of his constitutional right to due process of law, as guaranteed by the Fifth Amendment.

50.    If Mr. Lee's execution is carried out without his having been provided a fair and unobstructed clemency process, he will, without question, have been deprived of the due process to which he is entitled.

51.    Mr. Lee lacks adequate remedies at law to address Defendants' violations and seeks injunctive relief restraining Defendants from continuing to violate his due process rights as alleged herein.

**B.    Deprivation of Fifth Amendment Right to Due Process—Defendants' Actions and Policies Stripped Mr. Lee of the Basic Procedural Safeguards He is Entitled to in Capital Clemency Proceedings.**

52.    Mr. Lee re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

53.    The Due Process Clause of the Fifth Amendment guarantees that Mr. Lee be afforded basic procedural safeguards in clemency proceedings, where the Government has created specific procedures for petitioners to utilize in seeking clemency. *See Woodard*, 523 U.S. at 288-89 (O'Connor, J., concurring); *see also, Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (where

government creates discretionary system for jurors, defendant has liberty interest in exercise of that discretion); *see also Young*, 218 F.3d at 853.

54. Mr. Lee, like the death-sentenced petitioner in *Young*, has attempted to utilize the clemency process that the Government itself has created for review and consideration of clemency petitions, and has encountered Defendants' interference in that process preventing him from obtaining and presenting critical evidence in support of his petition for commutation. *See id.* (noting such "conduct on the part of a state official is fundamentally unfair. It unconscionably interferes with a process that the State itself has created. The Constitution of the United States does not require that a state have a clemency procedure, but, in our view, it does require that, if such a procedure is created, the state's own officials refrain from frustrating it by threatening the job of a witness").

55. By the actions and policies described above, the Defendants have violated and deprived Mr. Lee of his constitutional right to due process of law, as guaranteed by the Fifth Amendment.

56. If Mr. Lee's execution is carried out without his having been provided a fair and unobstructed clemency process, he will, without question, have been deprived the due process to which he is entitled.

57. Mr. Lee lacks adequate remedies at law to address Defendants' violations and seeks injunctive relief restraining Defendants from continuing to violate his due process rights as alleged herein.

    **C.**     **Deprivation of First Amendment Rights to Free Speech—Defendants' Actions and Policies Prohibit USP Terre Haute Correctional Staff Members from Exercising Their Rights to Provide Information in Support of Mr. Lee's Petition for Executive Clemency.**

58. Mr. Lee re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

59.     Mr. Lee meets the criteria for third party standing to bring this action under the Free Speech Clause of the First Amendment on behalf of USP Terre Haute correctional staff who wish to provide statements in support of his clemency petition but who have been barred from doing so due to Defendants' actions and policies. *See Powers v. Ohio*, 499 U.S. 400, 409-412 (1991) (criminal defendants have standing to assert the interests of minority jurors improperly removed by the state both because of the practical difficulties in expecting jurors to litigate the matter themselves, and because defendants' stake in the outcome of the proceeding assures they will litigate the claim aggressively); *see also Shimer v. Washington*, 100 F.3d 506, 508-09 (7th Cir. 1996) (clemency petitioners may assert First Amendment violations on behalf of prison guards where the guards have indicated their willingness to write on petitioner's behalf but refrained from doing so in light of restrictive prison policy). Mr. Lee has a concrete interest in this litigation, as the prohibition on correctional staff members' ability to provide information in support of him in the clemency process "will affect him adversely," and may "hinder the flow of information—a procedural defect which may act to his detriment." *Id.* at 508. The information the correctional staff members wish to share is "particularly pertinent," as it is they "who have daily contact with [Mr. Lee] and therefore can realistically assess his person." *Id.* The information they wish to provide, moreover, has enhanced importance because it refutes false and inflammatory allegations about his "future dangerousness."

60.     Public employees, like the USP Terre Haute correctional officers who wish to provide material information in support of Mr. Lee's clemency petition in their capacity as private citizens, have a constitutionally protected interest in freedom of speech that cannot be suppressed under threat of reprisal, discipline, or discharge. *See e.g., Garcetti v. Ceballos,* 126 S.Ct. 1951, 1958 (2006) ("The First Amendment limits the ability of a public employer to leverage the

23

employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens"); *Pickering v. Board of Education*, 391 U.S. 563, 574 (1968) (noting that "it is apparent that the threat of dismissal from public employment is…a potent means of inhibiting speech.").

61.     The USP Terre Haute corrections officers' prohibited speech addresses a matter of public concern, as it relates to the Government wielding its awesome power to execute Mr. Lee despite grave constitutional violations and serious allegations of official misconduct; and their ability to speak as citizens to administrative officials involved in the exercise of the clemency power—the traditional "'fail safe' in our criminal justice system," *Herrera v. Collins*, 113 S.Ct. 853, 868 (1993)—and expose the truth about Mr. Lee's good character and behavior in prison, outweighs the interest of their employer "in promoting efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968); *see also Connick v. Myers*, 461 U.S. 138, 147-48 (1983); *Garcetti*, 126 S.Ct. at 1956-59; *Eberhardt v. O'Malley*, 17 F.3d 1023, 1026 (7th Cir. 1994) ("The greater the potential social, as distinct from purely private, significance of the employee's speech, the less likely is the employer to be justified in seeking to punish or suppress it."). Notably, courts around the country have recognized that statements on equally or less pressing matters occupy "the highest rung of hierarchy of First Amendment values." *Connick*, 461 U.S. at 145; *see Barnard v. Jackson County, Mo.*, 43 F.3d 1218, 1225 (8th Cir.), *cert denied*, 516 U.S. 808 (1995) (collecting cases); *see, e.g., Buzek v. County of Saunders*, 972 F.2d 992, 995 (8th Cir. 1992) (letter written voluntarily by police officer on defendant's behalf at sentencing was a matter of public concern).

62.     By the actions and policies described above, and through their deliberate interference with Mr. Lee's ability to obtain and present favorable, material evidence from USP Terre Haute

correctional staff in the capital clemency process, including that which refutes his alleged "future dangerousness," the Defendants have violated and deprived these correctional staff of their First Amendment rights. As a result of Defendants' actions and policies, these correctional staff members, should they choose to exercise their right to speak out and provide critical information in support of Mr. Lee, are potentially subject to threat of reprisal, discipline, or discharge, and/or other potential job-related harms, thereby effectively chilling their protected speech. *See Shimer*, 100 F.3d at 508.

63.     If Mr. Lee's execution is allowed to proceed before the USP Terre Haute correctional officers who wish to provide such information to support him in the clemency process have the opportunity to do so, the exercise of their free speech rights in this context will be meaningless and completely nullified.

64.     Mr. Lee lacks adequate remedies at law to address Defendants' violations and seeks injunctive relief restraining Defendants from continuing to violate the correctional officers' free speech rights as alleged herein.

## IV.
## Prayer for Relief

Wherefore, Mr. Lee prays for relief as follows:

1) Exercise jurisdiction over this action;

2) Issue appropriate declaratory and injunctive relief to stop the constitutional violations described above and to ensure that Defendants' are enjoined from interfering with USP Terre Haute correctional staff members speaking or writing on behalf of Mr. Lee's clemency petition, and to ensure that Mr. Lee is able to obtain and present statements

from USP Terre Haute correctional staff unencumbered by Defendants' obstruction in the executive clemency process;

3) Enjoin Defendants from carrying out Mr. Lee's scheduled execution—if the injunction currently in place in this Court is lifted in the challenge to the Government's execution protocol—so that he may utilize the clemency process unencumbered by the Defendants' violation of his rights under the Fifth Amendment and the violation of the rights of USP Terre Haute correctional staff who wish to provide information and/or statements supporting him in the clemency process under the First Amendment; and

4)  Grant such other relief as this Court deems just and proper.

Respectfully submitted,


/s/ Ruth Friedman

Ruth Friedman
Federal Capital Habeas Project
Federal Defender for the District of Maryland
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 344-0600
Ruth_Friedman@fd.org


/s/ John Nidiry

John Nidiry
Federal Capital Habeas Project
Federal Defender for the District of Maryland
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 807-1267
John_Nidiry@fd.org

Counsel for Daniel Lee


Dated: December 2, 2019