**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **DANIEL LEWIS LEE** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No. 1:19-cv-03611-TSC** |
| | : | |
| **WILLIAM P. BARR, et al.** | : | **CAPITAL CASE** |
| | : | |
| | : | |
| **Defendants.** | : | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS COMPLAINT**

Plaintiff Daniel Lee has alleged with substantial detail in his Complaint, *see* Dkt. 1[1], that

Defendants deliberately interfered with and obstructed his ability to obtain and present favorable,

material evidence in the executive clemency process established for individuals under a death

sentence. He has alleged that their interference and obstruction violated his Fifth Amendment

right to due process and the First Amendment rights of correctional officers who wish to provide,

in their capacity as private citizens, critical information in support of his clemency application

but who have been barred from doing so as a result of Defendants' actions and policies.[2]

On January 22, 2020, Defendants filed a Motion to Dismiss the Complaint, *see* Dkt. 14.

They assert that Mr. Lee has not sufficiently pled allegations that meet the criteria for

---

[1] Citations to the Complaint are by paragraph, not page number.

[2] Pursuant to Fed. R. Civ. P. 15(a)(1), Mr. Lee has separately filed an Amended Complaint. As reflected in this Response, Mr. Lee believes he has sufficiently pled his original complaint, but out of an abundance of caution, he has amended it to include additional factual support and points of clarification as well as to reflect events that have taken place since the original complaint was filed. A redlined copy of the Amended Complaint is attached as an Exhibit to this Response for the Court's convenience, and cited and referred to (as Exh. 1 _ ) where appropriate.

establishing third-party standing, and therefore his First Amendment claim raised on behalf of the correctional officers should be dismissed under Fed. R. Civ. P. 12(b)(1); and that his First Amendment claim and Fifth Amendment due process claims should be dismissed under rule 12(b)(6). As explained below, Defendants' motion misstates relevant law, cherry-picks singular factual allegations from Mr. Lee's well-pled Complaint, and at times misconstrues his allegations. In light of the legal standards applicable at the pleading stage; the plausible allegations made in support of his claims in the Complaint; the additional allegations made in his Amended Complaint; and the anticipated additional factual development that will be necessary, Mr. Lee respectfully requests that Defendants' motion be denied in its entirety. The Court has jurisdiction in this matter, and Mr. Lee has met his pleading burden for the case to proceed.

## I.      Factual and Procedural Background

The Government had planned to execute Daniel Lee by lethal injection on December 9, 2019, which would have made his the first federal execution to take place in over sixteen years. *See* Complaint, ¶ 15. This Court enjoined the Government from carrying out his and other executions in light of a challenge that remains before the courts.[3] The Government has indicated that it intends to execute Mr. Lee if and when no court order prohibits it.[4]

Upon receiving notification of the previously scheduled execution date, Mr. Lee, on August 30, 2019, filed an application for commutation of his sentence with the Defendant Office of the Pardon Attorney, which is part of the cabinet-level agency, Defendant U.S. Department of Justice ("DOJ"). *See id.* at ¶ 16. He did so in compliance with and pursuant to the formal

---

[3] *See In The Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-145, Dkt. 51 (D. D.C. Nov. 20, 2019).

[4] *See* Exh. 1(Amended Complaint), ¶ 15.

2

procedures made available to the public and developed for individuals in federal custody to seek relief from the President in the form of executive clemency, as well as pursuant to specific procedures designed for death-sentenced prisoners seeking such relief. *See id.*; *see also*, 28 C.F.R. §§ 1.1-1.11.

Although his clemency petition remained pending when the Complaint initiating this lawsuit was filed, he has since withdrawn his petition in light of 28 C.F.R. § 1.10(e), which states: "Only one request for commutation of a death sentence will be processed to completion, absent a clear showing of exceptional circumstances." *Id.*; *see also,* Dkt. 13, p. 2-3. While there is uncertainty at this point about whether or when an execution date will be scheduled for Mr. Lee, and about how the events related to the capital clemency process will unfold if and when an execution date is set, Mr. Lee anticipates filing a new application for commutation of his death sentence with the Office of the Pardon Attorney, pursuant to the established procedures, should a new date be scheduled. In that sense, and because Mr. Lee also anticipates Defendants' continued obstruction with his ability to obtain declarations or testimony from the correctional officers who wish to support him, he agrees with Defendants that "the issues presented in the complaint remain live." *See* Dkt. 14, p. 6.

As set forth in his Complaint, these procedures have been developed, by necessity, over the course of American history as the administrative system generally, and the federal justice system more specifically, have grown in size and complexity. *See* Complaint, ¶¶ 33-44. They have also notably, for more than a half-century, been described in federal regulations formally published for the public, and include substantial requirements for members of the public and death-sentenced prisoners like Mr. Lee to meet, in order to have their petitions for executive clemency properly considered; they, moreover, as is apparent from the regulations, authorize

various administrative officials within the DOJ to undertake certain duties in the clemency process, in order to ensure that the cases worthy of relief are before the President. *See id.*

In the course of attempting to utilize these mandatory procedures and submit evidentiary support for the grounds presented in his petition, Mr. Lee learned that Defendant BOP's employees—members of the corrections staff at USP Terre Haute, where he is incarcerated in the Special Confinement Unit (SCU) with other federally death-sentenced prisoners—have critical information they wish to provide on behalf of Mr. Lee's commutation effort. *See id.* at ¶¶ 20-26. As alleged in the Complaint, the information these staff members wish to share includes but also goes beyond both the run-of-the-mine positive character evidence typically marshaled by clemency petitioners and that which demonstrates his positive adjustment while in custody, the latter a factor typically considered important for obtaining clemency.[5] The corrections officers' accounts and opinions, which in some instances are based on close to twenty years of daily interactions and close contact[6], offer proof—from uniquely positioned Government sources[7]—of one of the central arguments Mr. Lee has made about the worthiness of clemency

---

[5] *See, e.g.,* Section 9-140.113 of the Justice Manual (Standards for Considering Commutation Petitions) (noting "demonstrated rehabilitation" while in custody among factors); *see also, e.g.,* Arkansas State Commutation Application (noting exemplary institutional adjustment among "Reasons for Requesting a Commutation") *available at* https://www.paroleboard.arkansas.gov/Websites/parole/images/CommutationApplication021909.pdf (last visited Feb. 12, 2019).

[6] Defendants seek to reframe and minimize these interactions, referring to them as merely "limited," *see* Dkt. 14, p. 15, and sidestep Mr. Lee's allegations about the substance of those interactions and context in which they have arisen. *See* Complaint, ¶¶ 20-26. The substance and context of the interactions are also discussed in more detail in the Amended Complaint. *See* Exh. 1, ¶¶ 20-29; 63.

[7] Mr. Lee presented evidence from other sources to the Office of the Pardon Attorney to debunk misleading allegations about Mr. Lee posing a "future danger," including from individuals who knew him prior to his arrest and one of the jurors who sentenced him to death. *See* Complaint, ¶ 19.

relief in his case. *See id.* at ¶¶ 17-19; 20-27. That is, their accounts and opinions powerfully and directly refute false allegations made by the prosecution at trial about Mr. Lee's "future dangerousness" and propensity for violence, which were used to secure his death sentence. *See id.*

As described in the Complaint, when Mr. Lee sought to obtain this material evidentiary support from the corrections officers so that it could be presented to the administrative officials within the DOJ—i.e., at the Office of the Pardon Attorney ("OPA")—who are tasked with taking such evidence in the clemency process and, as part of that process, determining whether to make favorable recommendations to the President regarding petitions filed with them, he encountered deliberate interference and obstruction. *See id.* at ¶¶ 27-32. The officials in the OPA made clear during the proceeding held pursuant to 28 C.F.R. 1.10(c), at which Mr. Lee presented his case for clemency, that his alleged "future dangerousness," prison record and prison behavior were matters of grave concern to them. And yet Mr. Lee has been blocked from obtaining and presenting to the OPA the support for his clemency effort and the detailed information available from the corrections officials, who are particularly well-situated to speak on those matters and who wish to do so as private citizens. *See id.* at ¶¶ 20-26, 31, 58-64.

Mr. Lee has sought redress from this Court to prevent deprivations of his rights and the rights of those correctional officers on behalf of whom he has brought this lawsuit. Defendants' actions and policies barring him from access to this evidence violate his due process rights under the Fifth Amendment as well as the First Amendment rights of the correctional officers who wish to provide critical information in support of him in the clemency process but face the prospect of reprisals and other job-related harms for doing so. *See id.* at ¶¶ 21, 45-64.

As discussed in more detail below, and contrary to Defendants' assertions otherwise, Mr. Lee has sufficiently alleged the criteria for establishing third-party standing in connection with his First Amendment Claim, in light of the concrete injury he suffers, the closely aligned interests between him and the SCU officers, and the practical obstacles the officers face in litigating their rights to speak in support of Mr. Lee.[8] *See id*. at ¶¶ 58-64. These constitutional violations, the facts from which they arise, and the relief requested are, moreover, inextricably intertwined. The relief sought is necessary and appropriate in order to allow Mr. Lee and the correctional officers to exercise their rights unencumbered by Defendants' actions and policies, while Mr. Lee utilizes the mandatory procedures created for pursuing capital clemency relief; and if his execution is allowed to proceed without his having been provided a fair and unobstructed clemency process, he will have been deprived of the Fifth Amendment due process rights to which he is entitled, and the First Amendment rights of the officers who wish to provide information in support of him in the clemency process will be meaningless and completely nullified. *See id.* at ¶¶ 45-64.

At this early stage of proceedings, Mr. Lee has sufficiently pled facts in support of his Fifth Amendment and First Amendment claims, and Defendants have not met their high burden for establishing the propriety of dismissal under Fed. R. Civ. P. 12(b)(1) or 12(b)(6). Moreover, his Amended Complaint contains additional, updated factual support and points of clarification in connection with his claims, and, as noted below, further fact development is needed.[9] For all

---

[8] He has also provided additional factual support for and clarified some aspects of his allegations relating to the third-party standing criteria in his Amended Complaint. *See* Exh. 1, ¶¶ 22-24, 61-67.

[9] Given the peculiar circumstances of the case, including the uncertainty surrounding the setting of an execution date and how the clemency process will unfold, it should also be noted that some relevant facts could change in the near future.

these reasons, Mr. Lee should be granted the opportunity to prove his case in due course.

## II.      Legal Standards

A complaint need only provide "a short and plain statement … showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When ruling on a motion to dismiss, the Court must accept as true all facts plausibly pleaded in the complaint, drawing all reasonable inferences in the plaintiff's favor. *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017). Plausibility does not mean certainty, or that a claim is more likely to succeed than not—it means that the claim rises "above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To the extent inferences must be drawn to show that the defendant is liable, they must merely be reasonable. *Hurd*, 864 F.3d at 678.

Plaintiffs are permitted to plead with less specificity, and even "on information and belief," regarding information in defendants' possession to which plaintiffs would not have access prior to discovery, or where the belief is based on facts that render the allegations plausible. *See Kelleher v. Dream Catcher*, L.L.C., 263 F. Supp.3d 322, 325– 26 (D.D.C. 2017); *see also*, *Evangelou v. District of Columbia*, 901 F.Supp.2d 159, 170 (D.D.C. 2012).

The burden is high for a party seeking to dismiss a claim under Fed. R. Civ. P. 12(b)(6). "Dismissal for failure to state a claim is appropriate only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Chandler v. D.C. Dep't of Corr.*, 145 F.3d 1355, 1360 (D.C. Cir. 1998) (citation and internal quotation omitted*); see also Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003) (noting that "the complaint need only set forth 'a short and plain statement of the claim'" and that the complaint need not even "allege every legal element or fact that must be proven") (citation omitted). A motion to dismiss is not an opportunity to evaluate the sufficiency

7

of the evidence supporting the complaint's allegations, and the court must "construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (internal quotation marks omitted).

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), which Defendants have argued as one of the bases for dismissal of Mr. Lee's First Amendment claim, courts "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) (quoting *Warth v. Seldin*, 422 U.S. 490, 501-02 (1975)). When jurisdiction over a case depends on a factual question, the court may independently review the evidence and conduct additional fact-finding to determine whether it has jurisdiction; it may also allow "the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing." *Haase*, 835 F.2d at 906; *see also Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992).

## III.    Argument

In his Complaint, Mr. Lee sets forth plausible factual allegations in support of three distinct but interrelated claims: 1) that Defendants' deliberate interference with his ability to obtain and present material evidence from correctional officers in support of his petition for clemency violates his Fifth Amendment right to due process; 2) that Defendants' actions and policies stripped him of the basic procedural safeguards he is entitled to in capital clemency proceedings, in violation of his Fifth Amendment right to due process; and 3) that Defendants' actions and policies prohibiting correctional officers from expressing support for and providing

critical information in support of his clemency petition violates their free speech rights under the First Amendment. *See* Complaint, ¶¶ 45-64. As explained below, Defendants, who have raised defenses under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), have not met the exacting requisite standard for dismissal of these claims. *See Chandler,* 145 F.3d at 1360.

## A.   The Facts Alleged in Support of Mr. Lee's Fifth Amendment Due Process Claims Are Sufficiently Pled.

With respect to Mr. Lee's two Fifth Amendment due process claims, Defendants take the position that the Complaint should be dismissed under Fed. R. Civ. P. 12(b)(6), arguing in essence that *Young v. Hayes*, 218 F.3d 850 (8th Cir. 2000)—a case involving deliberate interference by state officials in the course of a death-sentenced prisoner's clemency proceedings and in which Mr. Lee finds support—is "outdated." *See* Dkt. 14, p. 12. Citing a few cases decided since the *Young* decision, and highlighting the concurrence of a sole judge who "advocated the abrogation of *Young*," Defendants urge the Court to completely foreclose Mr. Lee from having any opportunity to prove his claims. *See* Dkt. 14, p. 12. But even the Eighth Circuit, in *Winfield v. Steele*, 755 F.3d 629 (8th Cir. 2014) (*en banc*)—a key case Defendants rely on for dismissal of Mr. Lee's claims—made clear that *Young* was "distinguishable on its facts," and wrote that, "we express no view in this opinion on the merits of" that case. *See Winfield*, 755 F.3d at 631. *Young*, thus, remains good law and instructive here.

*Winfield* and the other cases cited by Defendants are also, moreover, factually distinguishable from the allegations made in Mr. Lee's Complaint. The court in *Winfield*, for example, found due process protections were satisfied primarily because "the Department of Corrections now has furnished [the officer's] signed declaration in support of clemency to the governor" and because there was "no evidence that any other state employee has been deterred from speaking in support of clemency for Winfield." *Id.* Mr. Lee's Complaint alleged that he has

not been able to obtain statements or testimony from any of the officers who have indicated their desire to provide such support, because of Defendants' actions and policies.

More to the point, at this early stage of proceedings, the facts as pled, taken as true, and construed liberally in his favor, easily survive Fed. R. Civ. P. 12(b)(6). *Barr,* 370 F.3d at 1199; *Chandler,* 145 F.3d at 1360; *Hurd*, 864 F.3d at 678.

The Government does not—and cannot—claim that Mr. Lee has no due process rights in his capital clemency proceeding. *See* Dkt. 14, at 10.  As the court in *Young* explained, citing *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 288-289 (1998), such a view—that a capital clemency petitioner is afforded no due process protections—is "inconsistent with the position…taken by a majority of the Supreme Court." *Young*, 218 F.3d at 852-53. Rather, the question before this Court at this juncture is whether Mr. Lee has adequately pled his claims that Defendants violated his due process rights in the course of his capital clemency proceeding, a fact-bound inquiry involving a distinct set of allegations and a distinct set of federal clemency procedures, where all reasonable inferences must be drawn in his favor. *See Hurd*, 864 F.3d at 678.

As set forth with specificity in his Complaint, Mr. Lee, like the death-sentenced petitioner in *Young*, alleged he has encountered obstruction and deliberate interference by Government officials; those officials, all of whom are part of the DOJ, have, through their actions and agency policies, thwarted his ability to gather and present favorable, material evidence from important witnesses, USP Terre Haute SCU correctional officers, that both supports his clemency application and directly and powerfully refutes the prosecution's central—and grossly misleading—claim in his trial proceeding that he poses a "future danger." *See* Complaint, ¶¶ 17, 20-32, 45-51. As demonstrated by the questions posed to Mr. Lee's counsel by officials in the

10

Office of the Pardon Attorney—officials tasked with reviewing, investigating and deciding whether to make a favorable recommendation on his application—falsehoods about his propensity for violence both matter to key decision-makers in the clemency process and persist unchallenged as a direct result of deliberate interference in that process. *See id.* at ¶ 30. The Defendants—Government actors who are themselves part of the prosecuting body—are obstructing his access to material evidence that powerfully undermines misrepresentations on which their case for death relies from being presented in the clemency process. This is an important component of one of his two due process claims, *see id.* at ¶¶ 45-51, and is among the features of his case that distinguishes it from other death-sentenced petitioners seeking to vindicate due process rights in the clemency context. *See, e.g., Noel v. Norris*, 336 F.3d 648, 649 (8th Cir. 2003) ("On the other hand, if the *state actively interferes* with a prisoner's access to the very system that it has itself established for considering clemency petitions, due process is violated.") (emphasis added).

Mr. Lee has also made sufficiently specific factual allegations in his Complaint that support his claim that Defendants' actions and policies have stripped him of basic procedural safeguards he is entitled to in capital clemency proceedings—his second alleged Fifth Amendment-based ground for relief. *See* Complaint, ¶¶ 52-57. As noted previously, that due process protections are afforded to death-sentenced clemency petitioners was acknowledged in *Woodard*; lower courts have since grappled with the contours of the process due, a fact-intensive undertaking that depends on the specific capital clemency procedures and how those procedures were applied in a particular case. With regard to this claim as well, Mr. Lee has met his pleading burden.

As set forth in the Complaint, the review and consideration of requests for clemency were

once an informal, ad hoc undertaking involving only the President and a few of his closest advisors. *See id.* at ¶¶ 36-43. That is no longer the case. A modern day system has been developed over time, operating with the hallmarks of the administrative state—duties related to the handling, investigation, and consideration of clemency petitions, for example, have by and large been delegated to career officials in the Office of the Pardon Attorney, positions created and funded by Congress, and other legislatively created agencies within the DOJ bureaucracy; and formal agency regulations have been promulgated for the general public and these administrative officials to follow. *See id.* at ¶¶ 33-44. At this point, countless persons seeking justice through the different forms of clemency relief, including those potentially eligible for pardon, the almost two hundred thousand in federal custody,[10] and the sixty-two under federal death sentence,[11] who have no direct line to the President, are, thus, by legislative and executive branch design steered to and dependent on this firmly rooted administrative system. *Id.*

Facing what he and other stakeholders in his case believe is an unjust execution, *see id.* at ¶¶ 17-18, Mr. Lee has no choice but to rely on the mandatory clemency process that the Government itself has created for review and consideration of clemency petitions for individuals under sentence of death, and as noted in his Complaint, he has sought to follow the requirements and utilize the procedures made available to him, pursuant to the regulations formally published for the public and prisoners alike, and those that apply in particular to capital cases; but Defendants' interference in that process has prevented him from obtaining and presenting

---

[10] *See* U.S. DEP'T OF JUSTICE, OFFICE OF JUSTICE PROGRAMS, BUREAU OF JUSTICE STATISTICS, PRISONERS IN 2017 (April 2019), available at https://www.bjs.gov/content/pub/pdf/p17.pdf (last visited Feb. 12, 2020).

[11] Federal Capital Habeas Project, *Growth in Federal Death Row Population*, available at https://2255.capdefnet.org/General-Statistics/Growth-Federal-Death-Row-Population (last visited Feb. 12, 2020).

significant evidence in support of his petition. *See, e.g., id.* at ¶¶ 20-32, 52-57.

As *Young* rightly points out, such

> conduct on the part of a state official is fundamentally unfair. It unconscionably interferes with a process that the State itself has created. The Constitution of the United States does not require that a state have a clemency procedure, but, in our view, it does require that, if such a procedure is created, the state's own officials refrain from frustrating it by threatening the job of a witness.

*Young*, 218 F.3d at 853; *see also, e.g., Noel,* 336 F.3d at 649; *Wilson v. U.S. Dist. Court for Northern Dist. of California,* 161 F.3d 1185, 1186-88 (9th Cir. 1998) (finding petitioner stated claim of violation of due process and upholding issuance of temporary restraining order prohibiting execution where clemency petitioner and his counsel reasonably relied on but were misled by clemency authority about issues to be considered).

The crux of Defendants' argument is that *Young* is outdated. But that is an insufficient basis for dismissal under Fed. R. Civ. P. 12(b)(6), where Mr. Lee's specific and plausible allegations, taken as true, claim Defendants have deprived him of due process protections he is entitled to in his federal capital clemency proceeding. *See Hurd*, 864 F.3d at 678.

## B. The Facts Alleged in Support of Mr. Lee's First Amendment Claim Are Sufficiently Pled.

Defendants also seek to dismiss the Complaint under Fed. R. Civ. P. 12(b)(1) contending that Mr. Lee has not sufficiently alleged facts to establish he has third-party standing to raise his First Amendment claim on behalf of certain SCU correctional officers, and under rule 12(b)(6) for failing to state a First Amendment claim. But Defendants misstate the relevant law and attempt to cherry-pick facts in a way that distorts the breadth and nature of Mr. Lee's allegations.

It should be noted, as an initial matter, that Defendants set up a "straw man" argument

that focuses on a particular prison policy, Federal Bureau of Prisons (BOP) policy 5840.04. *See* Dkt. 14, p. 14-15, 16-17. They claim this policy "does not prohibit the expression of any views" and creates a "streamlined process" for correctional officers to provide opinions about inmates. *Id.* at 14. They assert that because Mr. Lee failed to allege certain facts related to this policy—for example, that he did not allege "any BOP employee attempted to provide information in accordance with" that policy—that therefore his pleading is insufficient. *Id.* at 14-15. But, the focus on this policy serves to distract from Mr. Lee's allegations and claims: as clearly set forth in his Complaint, when he requested authorization to obtain information from the officers through BOP counsel, she stated his request "may fall under" BOP policy 5840.04, and that she was still "working on getting an answer" to Mr. Lee's request. *See* Complaint, ¶ 28. In short, Mr. Lee's allegations must be taken as true, *see Haase*, 835 F.2d at 906, and what Defendants' have offered up as the basis for dismissal of his well-pled Complaint is not responsive to the actual allegations in it, and if anything, points to the need for additional fact development.

1. **Mr. Lee's First Amendment claim should not be dismissed under Fed. R. Civ. P. 12(b)(1).**

Three prudential considerations are weighed in determining whether an individual may assert the rights of others: "(1) '[t]he litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute,' (2) 'the litigant must have a close relation to the third party,' and (3) 'there must exist some hindrance to the third party's ability to protect his or her own interests'." *Lepelletier v. F.D.I.C.*, 164 F.3d 37, 43 (D.C. Cir. 1999) (citing *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). If, as required, the material allegations of his complaint are accepted as true, and if the complaint, as required, is construed in his favor, Mr. Lee has met his pleading burden with respect to all three of these considerations. *See Haase*, 835 F.2d at 906. As noted below, he has also, nonetheless, added

14

facts and points of clarification regarding these three criteria in his Amended Complaint.

Although Defendants essentially treat them as non-existent, Mr. Lee has made plausible allegations regarding his "sufficiently concrete interest" in the outcome of this litigation: he has a life-or-death stake in the outcome of the capital clemency proceeding, and Defendants' actions and policies obstructing the SCU correctional officers' ability to provide information in support of him in the clemency process will affect him adversely. *See, e.g.,* Complaint, ¶¶ 20-32; 59[12]; *Lepelletier*, 164 F.3d at 43 (in case involving third-party standing, plaintiff's alleged loss of business opportunity easily satisfied "concrete interest" requirement). As the Seventh Circuit—in a case that Defendants have rather baldly asserted was wrongly decided—shrewdly observed, such a prohibition may "hinder the flow of information—a procedural defect which may act to [the clemency petitioner's] detriment." *Shimer v. Washington,* 100 F.3d 506, 508 (7th Cir. 1996) [13]. The information the correctional officers in Mr. Lee's case wish to share is "particularly pertinent," as it is they "who have daily contact with [Mr. Lee] and therefore can realistically assess his person." *Id.*; *see also,* Complaint, ¶ 59.[14] The information they wish to provide the OPA, moreover, has enhanced importance because it refutes false and inflammatory allegations about his "future dangerousness." *Id.*

---

[12] *See also* Exh. 1, ¶ 62.

[13] *See* Dkt. 14, at 16. Contrary to Defendants' position, the *Shimer* decision was not wrongly decided and remains persuasive and instructive in its third-party standing analysis at the summary judgment stage. The Seventh Circuit panel in that case properly considered the criteria for the plaintiff's assertion of third-party standing on behalf of corrections officers, and, moreover, correctly incorporated relevant First Amendment jurisprudence into its analysis. 100 F.3d at 508-09. *See also, infra* p. 17-18 (discussing the import of the First Amendment in evaluating third-party standing).

[14] *See also,* Exh. 1, ¶ 62.

Mr. Lee has also plausibly alleged, in his Complaint and now his Amended Complaint, the close relationship between him and the SCU officers who wish to speak on his behalf. *See id.* ¶¶ 20-32, 59 (describing both the nature of their relationship, close interactions, and basis for the SCU officers' opinions about Mr. Lee).[15] *Lepelletier*, 164 F.3d at 43. The "close relationship" factor requires only an alignment of interests such that "the plaintiff will act as an effective advocate of the third party's interests." *Lepelletier*, 164 F.3d at 44; *see also*, *Aid for Women v. Foulston*, 441 F.3d 1101, 1113 (10th Cir. 2006) ("The concern behind the 'close relationship' element is whether 'the third party can reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal'" (quoting *Sec'y of State of Md. v. Joseph H. Munson Co, Inc.*, 467 U.S. 947, 956 (1984)). Here, the interests of Mr. Lee and the correctional officers, as is clear from his Complaint, are neatly aligned: simply put, the officers seek to support him in the capital clemency process with detailed information, and Mr. Lee wants to include their support for him in the capital clemency process on which his life depends. As such, he can reasonably be expected to frame the issues in this litigation and present them with necessarily zeal, in the face of Defendants' obstruction. In that sense, Mr. Lee's due process rights in this case are "inextricably bound up" with the officers' First Amendment rights: "If Mr. Lee's execution is allowed to proceed before the USP Terre Haute correctional officers who wish to provide such information to support him in the clemency process have the opportunity to do so, the exercise of their free speech rights in this context will be meaningless and completely nullified." Complaint, ¶ 63; *see also Singleton v. Wulff*, 428 U.S. 106, 114-115 (1976).

Mr. Lee has also met his pleading burden regarding "hindrance" to the correctional officers' ability to protect their own interests. *Lepelletier*, 164 F.3d at 43. As alleged in his

---

[15] *See* Exh. 1, ¶¶ 20, 22-24, 34, 62.

Complaint and, with additional factual support in his Amended Complaint, these officers face threats of reprisal, discipline, discharge, and other possible job-related harms, which effectively chills their protected speech and thwarts their ability to assert their rights. *See* Complaint, ¶¶ 21, 62.[16] Such circumstances represent the sort of "practical obstacles" contemplated in the third-party standing context. *See Joseph H. Munson Co, Inc.*, 467 U.S. at 956; *see also Pennsylvania Psychiatric Soc. v. Green Spring Health Services, Inc.*, 280 F.3d 278, 290 (3rd Cir. 2002) (explaining that "a party need not face insurmountable hurdles to warrant third-party standing") (citing *Powers v. Ohio*, 499 U.S. 400, 415 (1991)).

It should, moreover, be noted that, contrary to the Government's assertion, *see* Dkt. 14, at 16, the Supreme Court, and subsequently courts in this Circuit, have made clear that within the context of free speech under the First Amendment, there are particular concerns and circumstances that justify a lessening of prudential limitations on standing, especially where there is a danger of speech being chilled. *See, Kowalski v. Tesmer,* 543 U.S. 125 (2004) (noting that the Court has been "quite forgiving with" the third-party standing criteria in certain circumstances, including within the context of the First Amendment) (citing *Joseph H. Munson Co., Inc.*, 467 U.S at 956; *see also, e.g., Reese Brothers, Inc. v. U.S. Postal Service*, 531 F. Supp. 2d 64, 69-70 (D. D.C. 2008) (finding criterion for third-party standing relaxed in light of alleged danger of chilled speech); *Nelson v. International Ass'n of Bridge, Structural, and Ornamental Iron Workers*, 680 F. Supp. 16, 24 (D. D.C. 1988) (noting "normally stringent requirement of injury in fact has been relaxed, however, in the First Amendment context"); *Ryan, LLC v. Lew*, 934 F.Supp.2d 159, 167-68 (D. D.C. 2013) (noting that plaintiff "correctly points out that the Supreme Court has seen fit to relax the 'hindrance' component of third-party standing in the free

---

[16] *See* Exh. 1, ¶¶ 21-22, 62.

speech context" and concluding that "the more forgiving approach to prudential standing requirements developed in the Speech Clause context should logically extend to claims under the Petition Clause."); *see also*, Complaint ¶ 21, 62; Exh. 1, ¶¶ 21-22, 62.

In light of the above, and considering the allegations he has set forth, the Court should deny Defendants' motion to dismiss for lack of standing.

**2.    Mr. Lee's First Amendment claim should not be dismissed under Fed. R. Civ. P. 12(b)(6).**

In addition to sufficiently establishing the basis, under Fed. R. Civ. P. 12(b)(1), for third-party standing, Mr. Lee has met his pleading burden under Rule 12(b)(6) for stating a First Amendment claim on behalf of the SCU corrections officers. Mr. Lee's showing on his First Amendment claim is further supported by the updated, additional facts and points of clarification in his Amended Complaint.

Speech by a public employee is protected where the employee speaks as a private citizen about a matter of public concern, and where the employee's speech interest outweighs "the interests of the government employee, as an employer, in promoting the efficiency of the public services it performs through its employees." *See Pickering v. Board of Ed. Of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 568 (1968); *Connick v. Myers*, 461 U.S. 138, 143 (1983); *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006); *Lane v. Franks*, 573 U.S. 228, 231 (2014).

Defendants, in seeking dismissal of Mr. Lee's First Amendment ground, apparently misconstrue his allegations—the officers do not wish to "provide [their] views and observations of Lee as [] prison guard[s]," and the fact that they may be "allowed to record" views and observations of him as part of their official duties, presumably pursuant to BOP policy 5840.04,

18

is, at least at this stage of the proceeding, immaterial to his claim.[17] As set forth in the Complaint, the USP Terre Haute correctional officers "wish to provide material information in support of Mr. Lee's clemency petition in their capacity *as private citizens*" but their ability to do so, as Mr. Lee has alleged, is being suppressed under threat of reprisal, discipline, or discharge. *See* Complaint, ¶¶ 21, 60-62.[18] Although the officers' suppressed speech is surely informed by their on-the-job time and experience with Mr. Lee, the officers are not speaking as employees in uniform or in their on-the-job prison setting, and providing expressions of support to the Office of the Pardon Attorney is not encompassed in their job duties.[19]

Defendants, moreover, take the same misguided approach to the meaning of "private citizen" speech that the Supreme Court cautioned against in *Lane*, a case involving the erroneous dismissal of a lawsuit at the summary judgment stage: "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* at 234, 240.

---

[17] As noted previously, as alleged in the Complaint, Mr. Lee's counsel were told that their request to collect statements from officers "*may*" fall under the policy—Bureau of Prisons policy statement 5840.04—Defendants rely so heavily on to dismiss his claim. *See* Complaint, ¶ 28. (Emphasis added.) At a minimum, the applicability of the policy creates a fact issue to be fleshed out in discovery rather than being decided on a motion to dismiss.

[18] Mr. Lee has, in the Amended Complaint, provided additional allegations related to the officers' speech in their capacity as private citizens. *See* Exh. 1, ¶¶ 24, 63-64.

[19] *See id.* at ¶ 23.

While discovery may be necessary to determine more precise contours of the officers' duties,[20] the allegations in Mr. Lee's Complaint—and now, in his Amended Complaint—taken as true and construed in his favor, suffice at this stage of the proceedings. *See Haase*, 835 F.2d at 906; *see also, e.g., Buddenburg v. Weisdack*, 939 F.3d 732, 740 (6th Cir. 2019) (finding plaintiff's allegations regarding her speech as a private citizen sufficient to survive motion to dismiss); *Montero v. City of Yonkers, New York*, 890 F.3d 386, 398 (2d. Cir. 2018) ("Because the district court did not squarely determine whether Montero's union speech was made *pursuant* to Montero's employment duties, its decision that the remarks necessarily failed to qualify as citizen speech protected by the First Amendment was thus at best premature.")

Defendants also argue the Complaint should be dismissed because the matters the officers wish to speak about are "inherently a matter of private concern," but Mr. Lee has sufficiently alleged that it is of "public concern," in light of the anticipated content of the officers' speech. Their speech relates to the Government's highly publicized interest[21] in carrying out Mr. Lee's execution "despite grave constitutional violations and serious allegations of official misconduct," and refutes the "future dangerousness" ground on which his death sentence rests.  Complaint, ¶ 61.[22] It also relates to subject matters—the restarting of federal executions, Mr. Lee's execution, his clemency bid, the inequities in his case, among them—that have garnered much attention in

---

[20] *See id.* at ¶ 23 (noting that SCU officers' job descriptions are, upon information and belief, not publicly accessible).

[21] *See* Complaint, ¶ 15 (citing Defendants' press release announcing the setting of Mr. Lee's execution date).

[22] He has also alleged additional factual support in connection with the public concern involved here. *See* Exh. 1, ¶ 64.

the public sphere.[23] Speech "involves matters of public concern 'when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Lane*, 573 U.S. at 241 (2014) (quoting *Snyder v. Phelps*, 131 S.Ct. 1207, 1216 (2011)). This is a fact-bound inquiry that "turns on the 'content, form, and context' of the speech." *Lane*, 573 U.S. at 241 (citing *Connick*, 461 U.S. at 147-48). While further fact development may be necessary in connection with determining the content, form, and context of the speech at issue, at this early stage of the proceeding, Mr. Lee has more than sufficiently pled facts relating the correctional officers' speech being a matter of public concern.

Finally, Defendants assert their interest outweighs the interests Mr. Lee has delineated in his Complaint on behalf of the officers. *See* Dkt. 14, 17-18; Complaint, ¶¶ 20-32; 59; 61.[24] But the balancing of these interests, much like the question of whether the speech relates to a matter of public concern, is a fact-intensive inquiry relating to content, form, and context, among other considerations, and Defendants' citations to policy and policy rationales cannot simply be taken at face value, especially where, as alleged in the Complaint, Mr. Lee was provided with a less than clear answer regarding the policies being invoked to prohibit the officers' speech.[25] *See e.g., Lane*, 573 U.S. at 242 ("We have also cautioned, however, that a 'stronger showing [of government interests] may be necessary if the employee's speech more substantially involve[s] matters of public concern.'") (citing *Connick*, 461 U.S. at 152); *Shimer*, 100 F.3d at 510 (in light of necessary speculation involved in balancing interests between prison guards who wished to

---

[23] *See* Exh. 1, ¶ 64.

[24] *See* Exh. 1, ¶ 64.

[25] *See* discussion *supra* 13-14; *see also, supra* note 17.

participate in clemency process and the State, and refusing to take State's citation of prison policy and rationales at face value, court remands case at summary judgment stage "for further fact-finding to illuminate challenged policy.")

Mr. Lee has alleged plausible allegations in his Complaint to establish his First Amendment claim. He has also provided additional factual support for his claim, and points of clarification, in his Amended Complaint. While further fact development may be necessary to determine the merits of his claim, at this juncture, Mr. Lee has met his pleading burden under Fed. R. Civ. P. 12(b)(6).

**Conclusion**

For the reasons stated herein, Defendants' Motion to Dismiss should be denied in its entirety.

Respectfully submitted,

/s/ John Nidiry
John Nidiry
Federal Capital Habeas Project
Federal Defender for the District of Maryland
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 807-1267
John_Nidiry@fd.org

/s/ David Victorson
David Victorson
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-5600
david.victorson@hoganlovells.com

22

/s/ Pieter Van Tol
Pieter Van Tol
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 909-0661
pieter.vantol@hoganlovells.com

Counsel for Daniel Lee

Dated: February 12, 2020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia using the CM/ECF system on February 12, 2020. Notice of this filing will be sent by email to the all parties that are registered users, including counsel for Defendants listed below; and the filing may be accessed through the Court's CM/ECF System.

Shannon S. Smith
Assistant United States Attorney
P.O. Box 1229
Little Rock, AR 72203
(501) 340-2600
Shannon.smith@usdoj.gov

Jamie G. Dempsey
Assistant United States Attorney
P.O. Box 1229
Little Rock, AR 72203
(501) 340-2600
Jamie.dempsey@usdoj.gov


Respectfully submitted,

/s/ John Nidiry
John Nidiry
Federal Capital Habeas Project
Federal Defender for the District of Maryland
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 807-1267
John_Nidiry@fd.org

Counsel for Daniel Lee


Dated: February 12, 2020

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **DANIEL LEWIS LEE** | : | |
| **Register Number 21303-009** | : | |
| **U.S. Penitentiary Terre Haute** | : | |
| **Terre Haute, IN 47802** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No. 1:19-cv-03611-TSC** |
| | : | |
| **WILLIAM P. BARR** | : | **CAPITAL CASE** |
| **Attorney General** | : | |
| **U.S. Department of Justice** | : | |
| **950 Pennsylvania Avenue, NW** | : | |
| **Washington, DC 20530;** | : | |
| | : | |
| **JEFFREY A. ROSEN** | : | |
| **Deputy Attorney General** | : | |
| **U.S. Department of Justice** | : | |
| **950 Pennsylvania Avenue, NW** | : | |
| **Washington, DC 20530;** | : | |
| | : | |
| **ROSALIND SARGENT-BURNS** | : | |
| **Acting Pardon Attorney** | : | |
| **Office of the Pardon Attorney** | : | |
| **950 Pennsylvania Avenue, NW** | : | |
| **Washington, DC 20530;** | : | |
| | : | |
| **KATHLEEN HAWK SAWYER** | : | |
| **Director** | : | |
| **Federal Bureau of Prisons** | : | |
| **U.S. Department of Justice** | : | |
| **320 First St., NW** | : | |
| **Washington, DC 20534;** | : | |
| | : | |
| **JEFFREY E. KRUEGER** | : | |
| **Regional Director** | : | |
| **Federal Bureau of Prisons** | : | |
| **North Central Region** | : | |
| **U.S. Department of Justice** | : | |

1

**400 State Avenue, Suite 800**          :
**Kansas City, KS 66101;**               :
                                         :
**and**                                  :
                                         :
**T.J. WATSON**                          :
**Complex Warden**                       :
**U.S. Penitentiary Terre Haute**        :
**4700 Bureau Road South**               :
**Terre Haute, IN 47802,**               :
                                         :
**In their official capacities; and,**   :
                                         :
**U.S. Department of Justice**           :
**950 Pennsylvania Avenue, NW**          :
**Washington, DC 20530**                 :
                                         :
**Federal Bureau of Prisons**            :
**U.S. Department of Justice**           :
**320 First St., NW**                    :
**Washington, DC 20534**                 :
                                         :
**Office of the Pardon Attorney**        :
**950 Pennsylvania Avenue, NW**          :
**Washington, DC 20530;**                :
                                         :
      **Defendants.**          :

## AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF THE FIRST AND FIFTH AMENDMENTS TO THE <u>UNITED STATES CONSTITUTION</u>

### I.
### <u>Nature of Action</u>

1.    Plaintiff Daniel Lewis Lee ("Mr. Lee") brings this action for injunctive and declaratory relief for violations of: (i) his right to due process under the Fifth Amendment to the U.S. Constitution, which have arisen in the course of his attempt to make use of mandatory procedures created for individuals under a federal death sentence seeking executive clemency;

2

and (ii) the right to free speech under the First Amendment to the U.S. Constitution, on behalf of correctional officers who have been barred, due to Defendants' actions and policies, from providing critical information in the form of declarations or testimony in support of Mr. Lee's petition for executive clemency.

## II.
## Parties

2.      Plaintiff Lee is a U.S. citizen and he is incarcerated at the United States Penitentiary in Terre Haute, Indiana ("USP Terre Haute"). He is a death-sentenced prisoner under the control and supervision of the Federal Bureau of Prisons ("BOP"), an agency within the U.S. Department of Justice ("DOJ"). He was scheduled for execution by lethal injection at the United States Penitentiary in Terre Haute, Indiana on December 9, 2019. That execution was enjoined by this Court in a separate proceeding.[1]

3.      Defendant William P. Barr is the Attorney General of the United States. Mr. Lee was remanded into the Attorney General's custody upon Lee's conviction and the imposition of his death sentence. Attorney General Barr oversees the BOP and the Office of the Pardon Attorney. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

4.      Defendant Jeffrey A. Rosen is the Deputy Attorney General of the United States. Under the supervision of the Attorney General, he oversees the day-to-day operations of the BOP and the Office of the Pardon Attorney. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

---

[1] *See* Order Granting Motion for Preliminary Injunction, *In re In The Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-145, Dkt. 51 (D. D.C. Nov. 20, 2019).

5. Defendant Rosalind Sargent-Burns is the Acting Pardon Attorney. She is charged with managing the day-to-day operations of the Office of the Pardon Attorney, including oversight of the review and investigation of clemency petitions and making recommendations on petitions, pursuant to the clemency process, to the Deputy Attorney General and Attorney General. She is sued here in her official capacity for the purpose of obtaining declaratory and injunctive relief.

6. Defendant Kathleen Hawk Sawyer is the Director of the BOP. She oversees the operations of BOP facilities, staff, and individuals in BOP custody, and serves the Deputy Attorney General and Attorney General. She is sued here in her official capacity for the purpose of obtaining declaratory and injunctive relief.

7. Defendant Jeffrey E. Krueger is the Regional Director of the North Central Region of the BOP. As such, he has the responsibility for USP Terre Haute, and he plays a critical role in the oversight of the operations of that prison, including policy implementation. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

8. Defendant T.J. Watson is the Complex Warden of USP Terre Haute, which is where Mr. Lee is confined. In that position, he is charged with management of USP Terre Haute and the oversight and implementation of operations and policies there. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

9. Defendant DOJ is a cabinet-level department of the federal government responsible for enforcement of the laws of the United States, for oversight and implementation of procedures relating to executive clemency, and for oversight of the BOP and implementation of BOP policies.

10. Defendant Office of the Pardon Attorney is an office within the DOJ responsible for reviewing, investigating, and making favorable or unfavorable recommendations regarding petitions for executive clemency.

11.    Defendant BOP is a sub-agency of the DOJ responsible for the care, custody, and control of individuals incarcerated by the Federal Government.

12.    Defendants are acting, and each of them at all times relevant hereto were acting, in their respective official capacities with respect to all acts described herein, and were in each instance acting under the color and authority of federal law in violating Mr. Lee's constitutional rights and the constitutional rights of BOP employees—USP Terre Haute correctional officers—seeking to provide critical information in the form of declarations or testimony in support of his clemency petition. Upon information and belief, unless preliminarily and permanently enjoined, each of the Defendants intends to act in his or her official capacity and under the authority of federal law in violating Mr. Lee's constitutional rights.

### III.
### Jurisdiction and Venue

13.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 2201 in that the claim for injunctive relief arises under the United States Constitution and federal statutes, including 5 U.S.C. § 702 which waives sovereign immunity for an action seeking relief other than monetary damages against an agency. The request for declaratory relief is based on 28 U.S.C. § 2201, in that an actual controversy exists between Defendants and Mr. Lee involving actions taken by the Defendants and policies applied by Defendants to Mr. Lee in violation of rights guaranteed by the United States Constitution. Defendants have obstructed Mr. Lee's ability to support his clemency petition with first-hand evidence from USP Terre Haute corrections personnel, including that which powerfully and directly refutes false claims the prosecution made in seeking a death sentence that he posed a continuing threat of violence in prison.

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1) because the DOJ, Office of the Pardon Attorney, and BOP headquarters are in this district; because a substantial part of the events giving rise to the claims made by Mr. Lee—including Defendants' actions pertaining to the executive clemency process in Mr. Lee's case—took place and continue to take place in this District; and because Defendants, the majority of whom reside in this District, were acting in their official capacities in violating Mr. Lee's and the USP Terre Haute correctional officers' constitutional rights.

## IV.
## Factual Background

**A.    Factual Allegations Pertaining to the Investigation and Preparation of Mr. Lee's Clemency Petition.**

15.    On July 25, 2019, Defendant DOJ and Defendant Attorney General Barr announced in a press release that Plaintiff Lee had been selected to be executed by lethal injection pursuant to a new protocol, and Defendant BOP was directed to set the date.[2] Mr. Lee was scheduled for execution December 9, 2019, the first of five men to be executed in a span of five weeks, and the first federal execution in over sixteen years.[3] Although the execution date has passed in light of the Court's preliminary injunction, *see supra* ¶2, note 1, the Government has declared its intention to move forward with Mr. Lee's execution as long as no court order prohibits it.

---

[2] *See* Press Release, U.S. Department of Justice, Federal Government to Resume Capital Punishment After Nearly Two Decade Lapse (July 25, 2019), available at https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse (last visited Feb. 12, 2020); *see also* Notice of Adoption of Revised Protocol, *Roane v. Barr*, Civ. No. 05-2337,  (D. D.C. July 25, 2019), Dkt. 385 (notifying plaintiffs in ongoing litigation challenging federal lethal injection protocol of revised protocol).

[3] *Id.*

16.    Upon receiving notification of the scheduled execution, counsel for Mr. Lee began to prepare for capital clemency proceedings on his behalf, and on August 30, 2019, Mr. Lee, consistent with the requirements of 28 C.F.R. § 1.10 ("Procedures Applicable to Prisoners Under a Sentence of Death Imposed by a United States Court"), filed a formal petition for commutation of his death sentence, addressed to the President of the United States, with the Office of the Pardon Attorney in the DOJ. *See* 28.C.F.R. §§ 1.1, 1.10(b).[4] Also consistent with these procedures, supplemental materials in support of the petition were submitted by September 13, 2019, and the Office of the Pardon Attorney scheduled an in-person meeting with Mr. Lee's counsel where evidence was presented on October 23, 2019. *Id.*

17.    Mr. Lee's petition for commutation of his death sentence is largely premised on two grounds. First, the victims' survivors, the judge who presided at trial and sentenced Mr. Lee to death, and the lead trial prosecutor, all oppose his execution—an extraordinary and rare, if not unprecedented, alignment of such views in a capital case. Second, the prosecution's misleading claim at the penalty phase of Mr. Lee's trial that he should be sentenced to death because he would otherwise pose a continuing threat of violent behavior in prison was then and remains today untrue; and that false and unreliable evidence about Mr. Lee posing a "future danger" led

---

[4] On December 13, 2019, following the passing of his previously scheduled execution date, Mr. Lee withdrew the clemency application pending before the Office of the Pardon Attorney, in light of 28 C.F.R. § 1.10(e), which states: "Only one request for commutation of a death sentence will be processed to completion, absent a clear showing of exceptional circumstances." On December 16, 2019, the OPA responded by email, stating in relevant part: "In accordance with your client's request, we have administratively closed his clemency file without further action. If he decides to renew his application in the future, i.e., if another date of execution is set, he may submit a new application, or you may submit a new application on his behalf." Mr. Lee anticipates filing a new clemency application, in compliance with and pursuant to the procedures set forth in § 1.10, if and when a new execution date is set.

7

to a disparate, unjust outcome where he was sentenced to death but his far more culpable co-defendant Chevie Kehoe's life was spared.

18.     The prosecution's misrepresentations about Mr. Lee's so-called "future dangerousness"—which provide the basis for this latter ground for clemency—were two-fold. First, it introduced false and inflammatory evidence that he was a "psychopath" as measured by a forensic instrument that has no place in a capital prosecution. The Government itself has quietly ceased using the instrument—Psychopathy Checklist-Revised (PCL-R)—to prove "future dangerousness" in capital cases.[5] Second, the prosecution suppressed information favorable to Mr. Lee and presented false claims at his sentencing that he was responsible as a youth for a prior murder in Oklahoma, for which he allegedly escaped culpability, in an effort to persuade jurors he fit the profile of a "psychopath" consistent with its PCL-R testing results and that he should not be spared again. Although the Government argued he was given a "gift" by the Oklahoma prosecutors who let him get away with murder, the truth was that they did not even have the option of charging him with a homicide; rather, the presiding judge determined that the evidence against him was legally insufficient to establish probable cause for murder.

19.     In support of this latter ground for clemency about the prosecution's misleading claims, Mr. Lee has submitted to the Office of the Pardon Attorney records from mental health providers who observed him as a youth, as well as declarations from individuals who knew him prior to his

---

[5] Of the 62 people currently on federal death row, Mr. Lee is the *only one* whose capital sentencing proceedings relied on aggravating evidence of future dangerousness based on the PCL-R and so-called "psychopathy" evidence. *See* Federal Capital Habeas Project, *Growth in Federal Death Row Population*, available at https://2255.capdefnet.org/General-Statistics/Growth-Federal-Death-Row-Population (last visited Feb. 12, 2020) (showing total number of individuals on federal death row). In every other federal capital case involving such evidence, the courts have either been able to reverse the judgment or precluded the evidence from ever being presented to the jury in the first place.

arrest in the capital proceeding, in an effort to debunk the bases for the alleged aggravating factor that Mr. Lee would be a future danger in prison; and he has provided a declaration from one of the jurors who sentenced him stating that although this juror was reluctant to believe Mr. Lee would pose a continuing threat of violence, the prosecution's presentation about him escaping culpability for the prior murder was important to the jury as a whole and ultimately swayed this juror's vote.

### 1.    The Material Evidence Mr. Lee Sought to Obtain

20.    As part of the preparation of his clemency petition, one of Mr. Lee's attorneys, George Kouros, communicated with a member of the correctional staff employed by Defendant BOP— an officer assigned for many years to the Special Confinement Unit (SCU),[6] where all men under federal death sentence are held—who has provided a detailed first-hand account; information about subject matters, relating to Mr. Lee, learned in the course of his employment; and his own personal opinions about Mr. Lee relating to the alleged "future dangerousness" aggravating factor, his character, and his behavior, among other issues. The correctional official provides important information and a unique perspective that—along with the views of the victims' family members, trial judge, and trial prosecutor—strengthens his case for commutation to life imprisonment without parole. The correctional official's account and opinions also powerfully and directly refute the claim that Mr. Lee presents a continuing threat of violence. This information was based on the correctional official's close interactions and communications with and daily observations of Mr. Lee in a federal correctional institutional setting over a period of

---

[6] The Special Confinement Unit (SCU) at USP Terre Haute is, as its name suggests, a special unit designed for inmates with "maximum custody" classification and enhanced security measures implemented by specially trained staff.

almost twenty years. He has further indicated that several other USP Terre Haute staff members are interested in providing similar accounts, information, and opinions in support of Mr. Lee.

21.     The names of this correctional staff member and others are not disclosed in the Complaint in order to protect their identities in light of expressed concerns about Defendants, supervisors, and co-workers subjecting them to threats, reprisals, discipline, demotions, unwanted transfers, and/or other potential job-related harms for providing any information in support of Mr. Lee's application for commutation.

22.     Upon information and belief, it is rare and extraordinary for the correctional officers to indicate an interest in supporting a federally death-sentenced inmate's application for commutation, as they have in Mr. Lee's case. These officers have not come forward or been able to give statements or testimony as private citizens in support of Mr. Lee because, upon information and belief, they face official sanctions, including, for example, loss of pay and possible termination, as well as unofficial consequences in the form of reprisals, such as being transferred from highly sought-after SCU positions, for attempting to do so. Yet it is these correctional officers who interact most closely and regularly with Mr. Lee and the other death-sentenced inmates, and, who generally get know them best through those day-to-day contacts.

23.     The SCU itself is a distinct setting within the sprawling federal prison system, physically set apart from the rest of USP Terre Haute where more than 1,300 inmates are incarcerated.[7] It has a relatively small core group of specially trained correctional officers dedicated to the care and custody of the subset of 62 death-sentenced inmates and a few others in restrictive conditions of confinement who are held in the unit. Upon information and belief, although their

---

[7] *See* https://www.bop.gov/locations/institutions/thp/ (last visited Feb. 6, 2020) (listing population as 1,329).

10

official job duties are not publicly accessible, these officers are tasked with, among other things, delivering meals to SCU inmates three times a day, and escorting them individually back and forth between their cells for use of the law library and computer, for legal and social visits, and for indoor and outdoor recreational time.[8] These are some of the closest and most frequent interactions inmates like Mr. Lee have with other people in the SCU, and it is, in part, through these interactions that the correctional officers have become intimately familiar with Mr. Lee's background, history, and behavior in the SCU over an extended period. The correctional officers also are—because of these close interactions—called upon to evaluate death-sentenced inmates like Mr. Lee regularly. They, for example, evaluate an inmate's work performance—in Mr. Lee's case, as an orderly—assessing the inmate's job proficiency; the quality of his work; ability to work with others; response to supervision and instruction; need for supervision and dependability; ability, interest, and eagerness to learn; and initiative. Once such evaluations are conducted, the officers' on-the-ground assessment is routed to, and filtered through, supervising staff members with less frequent contacts with and personalized familiarity with the inmate— first to department heads, then the Unit Team, which consists of a counselor, case manager, and unit manager, for review.

24.     It is, as noted, in this environment, and this context, that the correctional officers have gotten to know Mr. Lee personally over many years, watched him grow and adapt to prison, and experienced first-hand his positive attributes; and it is their particularized knowledge of him drawn from interactions with and observations of him in that environment that so uniquely

---

[8] The officers are also, for example, responsible for testing equipment, managing SCU recreation lists, and searching SCU cells for contraband. Upon information and belief, providing statements and/or testimony in connection with clemency proceedings is not part of the correctional officers' official job duties.

positions them to support his clemency application. Their personal views of him and their particularized knowledge of him as an individual, their personal and unique insights about him, developed through their close contacts with him, are broader and different from that which is reflected in their on-the-job evaluations of him. Because members of the Unit Team, the Associate Warden, and the Warden have contact with Mr. Lee that is far more limited than the interactions of the SCU officers discussed above, those officials' sanitized and potentially contradictory input is not a substitute.

25.     In August 2019, the member of the SCU correctional staff who spoke directly with Mr. Kouros conveyed to him details about his experience with Lee that are critically important to the clemency application. He explained to Mr. Kouros that he had gotten to know Mr. Lee well over the many years he had worked in the SCU, that Mr. Lee was a model inmate, and that Mr. Lee had always treated him with respect. He further stated that while some inmates cause disciplinary problems and cannot be controlled easily, Mr. Lee was not among these in that he was easy to manage and never gave him problems. He added that people are capable of change in prison, that they can be educated and better themselves, and that Mr. Lee was a good example of that.

26.     This member of the USP Terre Haute SCU correctional staff explained to Mr. Kouros during the aforementioned communications that he was aware of how Mr. Lee had been portrayed in the media, as a violent white supremacist, and that this was not in fact an accurate portrayal. According to him, Mr. Lee was an easy inmate to supervise, was well-liked by other inmates and other staff in the SCU, and got along with everyone, including non-white prisoners and staff. He added that most people unfamiliar with prisons make assumptions that all inmates are dangerous and uncontrollable, but that he has a perspective on the SCU population that is based on actually having worked there for years and on getting to observe and interact with the

12

inmates on a daily basis. He conveyed to Mr. Kouros that based on his experience, and on his knowing Mr. Lee for years, it was his opinion that Mr. Lee was not violent or dangerous, and that Mr. Lee was a "poster boy" for how an inmate could turn his life around in prison.

27.     This member of the SCU correctional staff further expressed during the aforementioned communications that Mr. Kouros should know that Mr. Lee had been given an orderly job in the SCU, and this said something in and of itself about how the correctional staff view Lee—he was trusted enough to be given that position because it meant periods of less restrictive conditions of confinement and supervision while performing his orderly job duties.

28.     This member of the SCU correctional staff further conveyed to Mr. Kouros during the aforementioned communications that in his experience, many of the men who go to prison do not come from stable homes and that the correctional officers who interact with them daily sometimes play a "father figure" or mentor role, teaching them how to grow and mature into men. He described Mr. Lee as "a man now" and that he accordingly treated the staff and other inmates with respect.

29.     Finally, this member of the SCU correctional staff informed Mr. Kouros during the aforementioned communications that he was aware of other staff members, including at least one ranking officer, who were interested in providing similar statements supporting Mr. Lee's clemency petition, but that he had been warned that the legal department had to first provide authorization for him and the others to provide such statements.

**2.     Defendants' Deliberate Interference with Mr. Lee's Ability to Obtain and Present Material Evidence in the Clemency Process, and Infringement on Correctional Staff Members' Right to Provide Information in Support of his Clemency Application.**

30.     Following these communications, the same SCU correctional staff member in late August informed Mr. Lee's counsel that approval was required for him to provide a statement in

13

connection with his clemency application. Mr. Lee's counsel then promptly contacted the USP Terre Haute legal department, in writing, requesting permission for members of the correctional staff to provide formal, sworn statements in support of Mr. Lee's petition for executive clemency. On September 6, 2019 an attorney from the legal department, Katherine Siereveld, by email informed Mr. Lee's counsel that in order to grant the request, she would have to "run this up the chain."  On the same day, Mr. Lee's counsel wrote an email back to Ms. Siereveld, stressing the importance of a timely response on the request from the legal department, due to a then-fast approaching deadline for submission of materials to the Office of the Pardon Attorney in support of the clemency petition.

31.     On September 9, 2019 counsel for Mr. Lee sent another email to Ms. Siereveld seeking an answer regarding the request to collect statements from correctional staff. Ms. Siereveld responded that she had been attempting to see who could authorize the request and whether it could be authorized "outside of the official progress report[s]," stating the request may fall under BOP Program Statement 5840.04, which apparently requires authorization for staff to "release official information or directly correspond with outside agencies or persons" about inmates' "background," "institutional behavior," or "progress." The same day, counsel for Mr. Lee followed up for clarity about what position BOP was taking on the matter, and Ms. Siereveld responded that she was still working on getting an answer.

32.     In response to a September 11, 2019 email from counsel for Mr. Lee seeking an update on the status of the request, Ms. Siereveld sent an email the following day, this time pointing to 28 C.F.R. § 571.41, a regulation pertaining to the BOP's sharing of general information with inmates about how to initiate the clemency process and the Office of the Pardon Attorney's procedures for obtaining recommendations from the Director of the BOP on clemency petitions,

14

which was not relevant to Mr. Lee's interest in independently obtaining and presenting to the decision makers declarations or testimony from correctional staff in support of his clemency petition. When Mr. Lee's counsel pressed for clarity on Defendant BOP's position regarding his request, Ms. Siereveld sent another email making clear that no staff member would be allowed to "offer opinions on Mr. Lee's clemency petition."

33.     Pursuant to 28 C.F.R. § 1.10(c), on October 23, 2019, at the Office of the Pardon Attorney, DOJ, in Washington D.C., counsel for Mr. Lee made a presentation and submitted evidence in support of his clemency petition to the presiding officials. During the proceeding, these officials, after making clear that they had reviewed parts of his trial record and BOP files, including his disciplinary records, asked counsel several pointed questions specifically about Mr. Lee's record at USP Terre Haute, his behavior there, his propensity for violence, with whom he associates, and his adjustment to prison and what kind of person he is today, among others. In response to the officials' questions, counsel for Mr. Lee explained that they did not have access to much of the detailed information necessary to answer the questions posed, but felt strongly that, if they did, Mr. Lee would be reflected in a positive light.[9]

34.     Counsel were, as a result of Defendants' actions and policies, unable to present a full measure of support for Mr. Lee's petition in the clemency process—namely, declarations or testimony from USP Terre Haute correctional personnel who know him personally and have interacted with him on a daily basis in a high security prison setting. These would have addressed what were clearly issues of serious concern for the officials about Mr. Lee's alleged

---

[9] Mr. Lee presents these questions and answers to the best of his recollection. Although the Office of the Pardon Attorney had a stenographer present, he was told that a transcript would be made for DOJ alone and that he would not have access to it despite his request.

15

"future dangerousness" as well as provided up-to-date information from Government sources about how Daniel Lee has changed in prison and who he actually is.

35.     Members of the USP Terre Haute correctional staff continue to possess highly relevant information that directly refutes the "future dangerousness" aggravator on which Mr. Lee's death sentence is based, and provides other facts contrary to representations made about him, but are being prevented from providing it in the clemency process. Because of Defendants' actions and policies, Mr. Lee is being deprived of his rights to meaningful access to that process, and the correctional staff who wish to share critical information, details, and opinions supporting him in that process are being deprived of their right to do so.

**B.      Factual Allegations Pertaining to the Process for Individuals Under Death Sentence.**

36.     The sole procedures for a person under a federal death sentence to petition the President of the United States for commutation are set forth in the Code of Federal Regulations, 28 C.F.R. § 1.1-1.10, with § 1.10 specifically governing the process petitioners must follow in capital cases. 28 C.F.R. § 1.10 was promulgated on August 2, 2000, in advance of what were then the first executions to be carried out by the Federal Government since the U.S. Supreme Court's decision in *Furman v. Georgia*, 92 S. Ct. 2726 (1972). The procedures applicable to persons under death sentence, among other requirements, set a strict deadline for the time for filing a clemency petition, and for submitting supplemental materials in support of the petition, to the Office of the Pardon Attorney in the DOJ; they describe the process—and only avenue—for the petitioner to present testimony and other materials in support of his petition to the Office of the Pardon Attorney, and the process—and only avenue—for the victims of an offense to provide their position on the petition. *See* 28 C.F.R. § 1.10.

16

37.     In addition to the mandatory procedures specifically applicable to persons under a death sentence seeking commutation, 28 C.F.R. §§ 1.1-1.11 set forth formal regulations that must be followed by anyone petitioning the President for relief in the form of executive clemency or pardon. Among them are regulations requiring submission of any petition for such relief to the Office of the Pardon Attorney, although petitions are to be addressed to the President, and requiring certain information be included in the petition; regulations describing the role of the Attorney General in investigating cases in which clemency relief is sought with assistance from agencies, such as the Federal Bureau of Investigations, in determining issues about disclosure of files and contacting victims, and in recommending favorable action by the President; regulations that permit the Attorney General to delegate duties related to the clemency process to others within DOJ, including the Office of the Pardon Attorney; and those that describe the process for notifications of grants and denials of petitions. *See* 28 C.F.R. § 1.1-1.11.

38.     The President's authority to grant pardons and reprieves and to commute sentences derives from Article II, Section 2, Clause 1[10] of the U.S. Constitution; however, mandatory procedures have been developed over the course of the last two centuries, in tandem with the growth of the administrative state, for petitioners, including members of the general public requesting pardon as well as prisoners in custody requesting commutation, to seek and potentially obtain such relief.

39.     In the early years of the Republic, the President relied directly on the advice of the Secretary of State and the Attorney General for reviewing petitions and exercising his pardon

---

[10] Article II, Section 2, Clause 1 in relevant part states: "The President…shall have power to grant reprieves and pardons for offenses against the United States except in cases of impeachment."

and clemency powers; by 1858, the review of petitions was transferred to the Attorney General while the issuing of warrants granting relief remained in the State Department's purview.[11] In 1865, Congress authorized the Attorney General to employ a pardon clerk to assist with the handling of petitions.[12]

40.      As the federal justice system grew in size and complexity, the U.S. Department of Justice was created, and the Office of Clerk of Pardons became part of it.[13] By 1887, the early iterations of a more formal process for members of the public seeking pardon and those in custody seeking commutation to follow, and the rules for administrative officials to handle pardon and clemency petitions, began to take shape:  according to the "Pardon Bureau" in the DOJ's Report to a Select Committee of the Senate, dated April 1887, for example, "Every application for pardon addressed to the President is referred to the Attorney General, and by him to the clerk of pardons for his prompt and appropriate attention."[14] The Pardon Bureau further reported then that the Clerk of Pardons was directed to solicit the views of the U.S. Attorney and, if practicable, the views of the district judge, and to keep records of the progress of applications "at every stage of

---

[11] *See* Homer Cummings & Carl McFarland, Federal Justice: Chapters in the History of Justice and the Federal Executive 149 (1937).

[12] *See* 13 Stat. 516 (authorizing Attorney General to employ one "pardon clerk").

[13]  *See* 16 Stat. 162 (establishing U.S. Department of Justice); *see also*, Records of the Office of the Pardon Attorney, National Archives (Record Group 204), 1846-1965 (noting "The Office of the Clerk of Pardons became a component of the newly created Department of Justice, pursuant to its enabling act, June 22, 1870 (16 Stat. 162), available at https://www.archives.gov/research/guide-fed-records/groups/204.html (last visited Feb. 12, 2020).

[14] *See* Exhibit 1, Alex R. Boteler, Clerk of Pardons, Report of Pardon Bureau, U.S. Department of Justice Report to Select Committee of the Senate, April 1887.

these proceedings," as part of the process for determining whether to make a favorable

recommendation to the President.[15] At the time, the Clerk of Pardons, according to the same

Report to the Senate, was overwhelmed by the growing number of petitions and the volume of

duties placed upon him, especially in connection with his ability to manage correspondence with

members of the public, and made clear to Congress the need for additional staff to assist him.[16]

41.     In 1891, the Office of the Clerk of Pardons was superseded by the Office of the Attorney

in Charge of Pardons, established in the DOJ pursuant to an act of Congress;[17] and, in 1893, by

Executive Order, the reviewing, investigating, and issuing of all warrants in connection with

petitions for commutation and pardons was consolidated within the DOJ.[18] The Office of the

Attorney in Charge of Pardons was redesignated the Office of the Pardon Attorney, as it is

known today, in 1894.[19]

---

[15] *Id.*

[16] *Id.*

[17] *See* 26 Stat. 946; *see also*, Records of the Office of the Pardon Attorney, National Archives (Record Group 204), 1846-1965, available at https://www.archives.gov/research/guide-fed-records/groups/204.html (last visited Feb. 12, 2020).

[18] *See* Exhibit 2, Exec. Order (June 16, 1893) (stating "I hereby direct that all warrants of pardon and commutation of sentence, heretofore prepared at the Department of State on the requisition of the Attorney General, be prepared and recorded in the Department of Justice under the seal of that Department and countersigned by the Attorney-General").

[19] *See* Records of the Office of the Pardon Attorney, National Archives (Record Group 204), 1846-1965, available at https://www.archives.gov/research/guide-fed-records/groups/204.html (last visited Feb. 12, 2020).

42.     The first formal clemency rules[20] were approved by President McKinley in 1898 and contained a few of the features of the modern day regulations pursuant to 28 C.F.R. § 1.1-1.11: for example, the rules directed members of the public and those in custody applying for such relief to address a petition to the President and forward it to the Attorney General; and, they set out the process for soliciting views of the U.S. Attorney and trial judge, including in capital cases, and the effect of those opinions on the Office of the Pardon Attorney's favorable treatment of the petition.

43.     Between 1898 and 1962, the formal clemency rules underwent occasional revisions, some of which appear in the modern day regulations—for example, the 1924 rules introduced the designated form to be submitted by members of the public and those in custody; and were adapted based on the expansion of the Republic,[21] and in light of the growing number of individuals incarcerated in federal prisons or on parole,[22] or those subject to prosecution under federal "Immigration, Narcotic, Naturalization, Postal, or Prohibition Laws."[23] The Federal

---

[20] Upon information and belief, the various versions of the formal clemency rules prior to their formal publication in the Federal Register are on file with the U.S. Department of Justice.

[21] *See* "Rules Relating to Application for Pardon," Department of Justice, Feb. 12, 1924 (noting special rules for petitioners from "Puerto Rico, Hawaii, Virgin Islands, and the Canal Zone…").

[22] *See id.* (noting "Applications for Executive clemency will not be considered until after the person convicted has served some portion of his sentence (nor ordinarily, until the prisoner has reached his parole period and been denied parole) except upon a substantial showing of innocence or some other exceptional circumstance, developed since the trial, which clearly justifies an extension of Executive clemency."); *see also,* 46 Stat. 325 (pursuant to 1930 Act of Congress, Bureau of Prisons was established within DOJ).

[23] *See id.*

20

Bureau of Investigations was first assigned a formal role in investigating the "record and conduct" of petitioners in 1946.[24]

44.    In 1962, the "Rules Governing Petitions for Executive Clemency" took on their modern day form and structure, and were for the first time formally published for the public in the Federal Register, which contains agency rules, proposed rules, public notices, administrative orders, and executive orders: "These regulations shall become effective on the thirty-first day following the date of their publication in the Federal Register."[25] The 1962 regulations remained in place until 1983, when two additions to the regulations were made and published in the Federal Register, 28 C.F.R. §§ 1.1-1.10;[26] and they were amended in 1993 to include a provision for notifying individuals under death sentence about the disposition of their petitions.[27]

45.    As noted previously, the regulations setting forth special procedures applicable to petitioners under federal death sentence like Mr. Lee, codified at § 1.10, went into effect in August 2000 and remain in place today.

46.    What was once an informal, ad hoc undertaking involving the President and a few of his closest advisors has developed into a modern day system operating with the hallmarks of the administrative state—duties related to the handling, investigation, and consideration of clemency petitions, for example, have by and large been delegated to career officials in the Office of the

---

[24] *See* "Rules Governing Petitions for Executive Clemency," Department of Justice, Jan. 19, 1946; *see also* 28 C.F.R. § 1.6(a).

[25] *See* "Rules Governing Petitions for Executive Clemency," Department of Justice, Oct. 30, 1962.

[26] *See* "Rules Governing Petitions for Executive Clemency," Department of Justice, May 5, 1983.

[27] *See* "Rules Governing Petitions for Executive Clemency," Department of Justice, Oct. 12, 1993.

21

Pardon Attorney and other agencies within the DOJ bureaucracy, situated well downstream from the President; and formal agency regulations have been promulgated for the general public and these administrative officials to follow. Countless persons seeking justice through the different forms of clemency relief, including those potentially eligible for pardon, the almost two hundred thousand in federal custody,[28] and the sixty-two under federal death sentence,[29] who have no direct line to the President, are by legislative and executive branch design steered to and dependent on this firmly rooted administrative system.

47.     It is against this backdrop that Mr. Lee, facing what he and other stakeholders in his case believe is an unjust execution, has turned to the traditional "'fail safe' in our criminal justice system." *Herrera v. Collins*, 113 S. Ct. 853, 868 (1993). In order to obtain such relief, he has no choice but to rely on the mandatory clemency process that the Government itself has created for review and consideration of clemency petitions for individuals under sentence of death. He has sought to follow the requirements, adhere to the deadlines, and utilize the procedures made available to him, pursuant to the regulations formally published for the public and prisoners alike, and those that apply in particular to capital cases; but in the course of attempting to follow the requirements of this process—for seeking, through the Office of the Pardon Attorney, a favorable recommendation on his petition to the President—he has encountered 1) the Defendants' obstruction of his ability to gather and present critical, material evidence, which refutes the case against him and exposes the lie on which his death sentence is based; and, 2) the

---

[28] *See* U.S. DEP'T OF JUSTICE, OFFICE OF JUSTICE PROGRAMS, BUREAU OF JUSTICE STATISTICS, PRISONERS IN 2017 (April 2019), available at https://www.bjs.gov/content/pub/pdf/p17.pdf (last visited Feb. 12, 2020).

[29] Federal Capital Habeas Project, *Growth in Federal Death Row Population*, available at https://2255.capdefnet.org/General-Statistics/Growth-Federal-Death-Row-Population (last visited Feb. 12, 2020)

Defendants' infringement on the correctional officers' ability to support his efforts in that process. He has no adequate remedy at law for these constitutional violations. And both he and those officers uniquely positioned to support him will suffer irreparable injury unless appropriate equitable relief is provided by the Court.

## V.
### Claims for Relief

**A. Deprivation of Fifth Amendment Right to Due Process—Defendants' Deliberate Interference with Mr. Lee's Ability to Obtain and Present Material Evidence from BOP Correctional Officers in Support of his Petition for Clemency.**

48.     Mr. Lee re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

49.     The Due Process Clause of the Fifth Amendment prohibits the Government from deliberately interfering with a witness's ability to speak with the representatives of a criminal defendant. *See, e.g., Gregory v. United States*, 369 F.2d 185, 187-89 (D.C. Cir. 1966). These protections afforded to Mr. Lee extend beyond the trial proceeding. *See, e.g., Blackledge v. Perry*, 417 U.S. 21 (1974) (due process prohibits prosecutorial retaliation for defendant's decision to seek retrial). Importantly, the protections of the Due Process Clause apply to capital clemency proceedings like Mr. Lee's, and the Government is prohibited from arbitrarily or perniciously denying a death-sentenced prisoner access to its clemency process. *See Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 288-89 (1988) (O'Connor, J., concurring); *see also, Young v. Hayes*, 218 F.3d 850, 853 (8th Cir. 2000) (granting stay of execution and remanding case with looming execution date in light of state actor's deliberate interference with petitioner's ability to present evidence to Governor in support of clemency petition, which violated Due Process protections).

50.     Defendants' actions and policies obstructing Mr. Lee's ability to gather and present favorable, material evidence from USP Terre Haute correctional staff members which directly refutes his alleged "future dangerousness" have deprived him of a meaningful opportunity to utilize procedures that he must comply with to pursue executive clemency relief. As demonstrated by the questions posed to Mr. Lee's counsel by officials in the Office of the Pardon Attorney—officials tasked with reviewing, investigating and deciding whether to make a favorable recommendation on his petition—falsehoods about his propensity for violence both matter to key decision-makers in the clemency process and persist unchallenged as a direct result of Defendants' deliberate interference in that process.

51.     These actions and policies have further interfered with Mr. Lee's ability to gather and present other evidence highly relevant to his petition for commutation.

52.     By the actions and policies described above, the Defendants have violated and deprived Mr. Lee of his constitutional right to due process of law, as guaranteed by the Fifth Amendment.

53.     If Mr. Lee's execution is carried out without his having been provided a fair and unobstructed clemency process, he will, without question, have been deprived of the due process to which he is entitled.

54.     An actual controversy exists between the parties regarding Defendants' actions and policies obstructing Mr. Lee's ability to gather and present favorable, material evidence from correctional officers, and a resolution by the Court will guide the parties' legal relations. Mr. Lee also lacks adequate remedies at law to address Defendants' violations. Accordingly, Mr. Lee seeks appropriate declaratory relief and injunctive relief restraining Defendants from continuing to violate his due process rights as alleged herein.

**B.    Deprivation of Fifth Amendment Right to Due Process—Defendants' Actions and Policies Stripped Mr. Lee of the Basic Procedural Safeguards He is Entitled to in Capital Clemency Proceedings.**

55.    Mr. Lee re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

56.    The Due Process Clause of the Fifth Amendment guarantees that Mr. Lee be afforded basic procedural safeguards in clemency proceedings, where the Government has created specific procedures for petitioners to utilize in seeking clemency. *See Woodard*, 523 U.S. at 288-89 (O'Connor, J., concurring); *see also, Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (where government creates discretionary system for jurors, defendant has liberty interest in exercise of that discretion); *see also Young*, 218 F.3d at 853.

57.    Mr. Lee, like the death-sentenced petitioner in *Young*, has attempted to utilize the clemency process that the Government itself has created for review and consideration of clemency petitions, and has encountered Defendants' interference in that process preventing him from obtaining and presenting critical evidence in support of his petition for commutation. *See id.* (noting such "conduct on the part of a state official is fundamentally unfair. It unconscionably interferes with a process that the State itself has created. The Constitution of the United States does not require that a state have a clemency procedure, but, in our view, it does require that, if such a procedure is created, the state's own officials refrain from frustrating it by threatening the job of a witness").

58.    By the actions and policies described above, the Defendants have violated and deprived Mr. Lee of his constitutional right to due process of law, as guaranteed by the Fifth Amendment.

25

59.     If Mr. Lee's execution is carried out without his having been provided a fair and unobstructed clemency process, he will, without question, have been deprived the due process to which he is entitled.

60.     An actual controversy exists between the parties regarding Defendants' actions and policies obstructing Mr. Lee's ability to gather and present favorable, material evidence from correctional officers, and a resolution by the Court will guide the parties' legal relations. Mr. Lee also lacks adequate remedies at law to address Defendants' violations. Accordingly, Mr. Lee seeks appropriate declaratory relief and injunctive relief restraining Defendants from continuing to violate his due process rights as alleged herein.

**C.      Deprivation of First Amendment Rights to Free Speech—Defendants' Actions and Policies Prohibit USP Terre Haute Correctional Staff Members from Exercising Their Rights to Provide Information in Support of Mr. Lee's Petition for Executive Clemency.**

61.     Mr. Lee re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

62.     Mr. Lee meets the criteria for third party standing to bring this action under the Free Speech Clause of the First Amendment on behalf of USP Terre Haute correctional staff who wish to provide statements in support of his clemency petition but who have been barred from doing so due to Defendants' actions and policies. *See Powers v. Ohio*, 499 U.S. 400, 409-412 (1991) (criminal defendants have standing to assert the interests of minority jurors improperly removed by the state both because of the practical difficulties in expecting jurors to litigate the matter themselves, and because defendants' stake in the outcome of the proceeding assures they will litigate the claim aggressively); *see also Shimer v. Washington*, 100 F.3d 506, 508-09 (7th Cir. 1996) (clemency petitioners may assert First Amendment violations on behalf of prison guards where the guards have indicated their willingness to write on petitioner's behalf but

refrained from doing so in light of restrictive prison policy). Mr. Lee has a concrete interest in this litigation. He seeks clemency relief, which for him is a matter of life or death. The prohibition on correctional staff members' ability to provide information in the form of declarations or testimony in support of him in the clemency process "will affect him adversely," and may "hinder the flow of information—a procedural defect which may act to his detriment." *Id.* at 508. The information the correctional staff members wish to share is "particularly pertinent," as it is they "who have daily contact with [Mr. Lee] and therefore can realistically assess his person." *Id.* The information they wish to provide, moreover, has enhanced importance because it refutes false and inflammatory allegations about his purported "future dangerousness." Mr. Lee's interest in presenting declarations or testimony from the correctional officers is identical and closely aligned with the officers' interest in expressing their support for him. And, in light of those inter-connected interests, Mr. Lee will serve as a zealous advocate on behalf of the officers, who face grave obstacles—loss of pay, discipline, demotions, unwanted transfers, and possible termination among them—for pursuing this lawsuit on their own behalf, essentially chilling their speech.

63.     The USP Terre Haute correctional officers wish to provide material information in support of Mr. Lee's clemency petition in their capacity as private citizens. As noted previously, providing such information in support of a death-sentenced clemency petitioner, is, upon information and belief, not ordinarily within the scope of the officers' job duties. While their declarations or testimony may concern information acquired by virtue of their employment, there is no reason or expectation that the speech at issue would need to be given on the job or in uniform. Simply put, they wish to express their personal support for Mr. Lee, someone they have gotten to know well, in the clemency process. That is a personal and private choice they are

making, and it is involves speech protected under the First Amendment. Public employees, like the officers, who wish to provide material information in support of Mr. Lee's clemency petition in their capacity as private citizens, have a constitutionally protected interest in freedom of speech that cannot be suppressed under threat of reprisal, discipline, or discharge. *See e.g., Lane v. Franks*, 573 U.S. 228, 239-40 (2014); *Garcetti v. Ceballos,* 126 S.Ct. 1951, 1958 (2006) ("The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens"); *Pickering v. Board of Education*, 391 U.S. 563, 574 (1968) (noting that "it is apparent that the threat of dismissal from public employment is…a potent means of inhibiting speech.").

64.     The USP Terre Haute corrections officers' prohibited speech addresses a matter of public concern, as it relates to the Government wielding its awesome power to execute Mr. Lee and to do so despite grave constitutional violations and serious allegations of official misconduct. The Government chose to highly publicize its intent to execute Mr. Lee, *see supra* note 2, and since then the issue of whether he, and others, should be executed has garnered a great deal of the public's attention.[30] The circumstances of Mr. Lee's execution, including his clemency bid and

---

[30] Upon information and belief, over 500 original opinion and original news stories were published from July 25, 2019, when DOJ announced their intent to execute Mr. Lee and others, through January 31, 2020, about the federal government restarting executions. That number does not include the dozens of instances where those original pieces were picked up by other sources, i.e., *Associated Press*, *Reuters*, and other news media, and reprinted on multiple websites and newspapers. In addition, a bi-partisan group of three hundred relatives of murder victims, current and former law enforcement officials and former judges signed letters urging the Administration to refrain from pursuing the executions, and effort that was highly publicized. *See, e.g.,* Mark Berman, "Hundreds of Victims' Relatives, Ex-officials Ask Trump Administration to Halt Federal Executions," https://www.washingtonpost.com/national/hundreds-of-victims-relatives-current-and-former-officials-ask-trump-administration-to-halt-federal-

the inequities in his case, have also drawn significant attention in the public sphere.[31] The

correctional officers' ability to speak as citizens to administrative officials involved in the

exercise of the clemency power—the traditional "'fail safe' in our criminal justice system,"

*Herrera v. Collins*, 113 S.Ct. 853, 868 (1993)—and expose the truth about Mr. Lee's good

character and behavior in prison, outweighs the interest of their employer "in promoting

efficiency of the public services it performs through its employees." *Pickering v. Board of

Education*, 391 U.S. 563, 568 (1968); *see also Connick v. Myers*, 461 U.S. 138, 147-48 (1983);

*Garcetti*, 126 S.Ct. at 1956-59; *Eberhardt v. O'Malley*, 17 F.3d 1023, 1026 (7th Cir. 1994) ("The

greater the potential social, as distinct from purely private, significance of the employee's speech,

the less likely is the employer to be justified in seeking to punish or suppress it."). Notably,

courts around the country have recognized that statements on equally or less pressing matters

occupy "the highest rung of hierarchy of First Amendment values." *Connick*, 461 U.S. at 145;

*see Barnard v. Jackson County, Mo.*, 43 F.3d 1218, 1225 (8th Cir.), *cert denied*, 516 U.S. 808

(1995) (collecting cases); *see, e.g., Buzek v. County of Saunders*, 972 F.2d 992, 995 (8th Cir.

1992) (letter written voluntarily by police officer on defendant's behalf at sentencing was a

matter of public concern).

65.     By the actions and policies described above, and through their deliberate interference

with Mr. Lee's ability to obtain and present favorable, material evidence from USP Terre Haute

---

executions/2019/11/12/90cede54-04cd-11ea-8292-c46ee8cb3dce_story.html (last visited Feb.
12, 2020).

[31] *See, e.g.,* Campbell Robertson, "She Doesn't Want Her Daughter's Killer to Be Put To Death.
Should the Government Listen?," https://www.nytimes.com/2019/10/29/us/arkansas-federal-death-penalty.html (last visited Feb. 12, 2020).

correctional staff in the capital clemency process, including that which refutes his alleged "future dangerousness," the Defendants have violated and deprived these correctional staff of their First Amendment rights. As a result of Defendants' actions and policies, these correctional staff members, should they choose to exercise their right to speak out and provide critical information in support of Mr. Lee, are potentially subject to threat of reprisal, discipline, or discharge, and/or other potential job-related harms, thereby effectively chilling their protected speech. *See Shimer*, 100 F.3d at 508.

66.     If Mr. Lee's execution is allowed to proceed before the USP Terre Haute correctional officers who wish to provide such information to support him in the clemency process have the opportunity to do so, the exercise of their free speech rights in this context will be meaningless and completely nullified.

67.     An actual controversy exists between the parties regarding Defendants' suppression of correctional officers' free speech rights under the First Amendment, in connection with Mr. Lee's capital clemency process. Mr. Lee also lacks adequate remedies at law to address Defendants' violations. Accordingly, Mr. Lee seeks appropriate declaratory relief and injunctive relief restraining Defendants from continuing to violate the correctional officers' free speech rights as alleged herein.

## IV.
## Prayer for Relief

Wherefore, Mr. Lee prays for relief as follows:

1) Exercise jurisdiction over this action;

2) Issue appropriate declaratory and injunctive relief to stop the constitutional violations described above and to ensure that Defendants' are enjoined from interfering with USP

Terre Haute correctional staff members speaking or writing on behalf of Mr. Lee's clemency petition, and to ensure that Mr. Lee is able to obtain and present declarations or testimony from USP Terre Haute correctional staff unencumbered by Defendants' obstruction in the executive clemency process;

3) Enjoin Defendants from carrying out Mr. Lee's scheduled execution—if the injunction currently in place in this Court is lifted—so that he may utilize the clemency process unencumbered by the Defendants' violation of his rights under the Fifth Amendment and the violation of the rights of USP Terre Haute correctional staff who wish to support him in the clemency process under the First Amendment; and

4) Grant such other relief as this Court deems just and proper.

Respectfully submitted,

/s/ John Nidiry
John Nidiry
Federal Capital Habeas Project
Federal Defender for the District of Maryland
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 807-1267
John_Nidiry@fd.org

/s/ David Victorson
David Victorson
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-5600
david.victorson@hoganlovells.com

31

/s/ Pieter Van Tol
Pieter Van Tol
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 909-0661
pieter.vantol@hoganlovells.com

Counsel for Daniel Lee

Dated: February 12, 2020

32

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia using the CM/ECF system on February 12, 2020. Notice of this filing will be sent by email to the all parties that are registered users, including counsel for Defendants listed below; and the filing may be accessed through the Court's CM/ECF System.

Shannon S. Smith
Assistant United States Attorney
P.O. Box 1229
Little Rock, AR 72203
(501) 340-2600
Shannon.smith@usdoj.gov

Jamie G. Dempsey
Assistant United States Attorney
P.O. Box 1229
Little Rock, AR 72203
(501) 340-2600
Jamie.dempsey@usdoj.gov

Respectfully submitted,

/s/ John Nidiry
John Nidiry
Federal Capital Habeas Project
Federal Defender for the District of Maryland
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 807-1267
John_Nidiry@fd.org

Counsel for Daniel Lee

Dated: February 12, 2020

33

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**


**DANIEL LEWIS LEE**                    **:**
                                        **:**
        **Plaintiff,**                  **:**
                                        **:**
        **v.**                          **:**    **Civil Action No. 1:19-cv-03611-TSC**
                                        **:**
**WILLIAM P. BARR, et al.**             **:**
                                        **:**
                                        **:**
        **Defendants.**                 **:**


## **EXHIBIT 1**

## THE DEPARTMENT OF JUSTICE. 21

The following table shows the number of days devoted to business by the employés of the division of appointments and disbursements:

### 1884.

| | January. | February. | March. | April. | May. | June. | July. | August. | September. | October. | November. | December. | Total. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Days | 31 | 29 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 | 366 |
| Sundays | 4 | 4 | 5 | 4 | 4 | 5 | 4 | 5 | 4 | 4 | 5 | 4 | 52 |
| Holidays | 1 | 1 | .... | .... | 1 | .... | 1 | .... | .... | .... | 1 | 1 | 6 |
| Working days | 26 | 24 | 26 | 26 | 26 | 25 | 26 | 26 | 26 | 27 | 24 | 26 | 308 |
| (32) class four | 26 | 24 | 26 | 26 | 26 | 25 | 26 | 21 | 26 | 27 | 24 | 26 | 303 |
| (44) class one | 26 | 24 | 26 | 26 | 26 | 22 | 24 | 26 | 24 | 25 | 8 | 21 | 278 |

### 1885.

| | January. | February. | March. | April. | May. | June. | July. | August. | September. | October. | November. | December. | Total. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Days | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 | 365 |
| Sundays | 4 | 4 | 5 | 4 | 5 | 4 | 4 | 5 | 4 | 4 | 5 | 4 | 52 |
| Holidays | 1 | 1 | .... | .... | 1 | 2 | .... | .... | .... | .... | 2 | 1 | 8 |
| Working days | 26 | 23 | 26 | 26 | 25 | 20 | 25 | 26 | 26 | 27 | 23 | 26 | 305 |
| (32) class four | 26 | 23 | 26 | 26 | 25 | 26 | 25 | 22 | 26 | 27 | 23 | 26 | 301 |
| (44) class one | 26 | 23 | 26 | 26 | 24 | 25 | 22½ | 26 | 26 | 7 | 23 | 25 | 270½ |
| (52) copyist* | .... | .... | .... | .... | .... | .... | 17 | 26 | 26 | 27 | 23 | 25 | 144 |

* Appointed July 9, 1886.

### 1886.

| | January. | February. | March. | April. | May. | June. | July. | August. | September. | October. | November. | December. | Total. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Days | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 | 565 |
| Sundays | 5 | 4 | 4 | 4 | 5 | 4 | 4 | 5 | 4 | 5 | 4 | 4 | 52 |
| Holidays | 1 | 1 | .... | .... | 1 | .... | 1 | .... | .... | .... | 2 | 1. | 7 |
| Working days | 25 | 23 | 27 | 26 | 25 | 26 | 26 | 26 | 26 | 26 | 24 | 26 | 306 |
| (34) class four | 25 | 23 | 27 | 26 | 25 | 26 | 26 | 26 | 26 | 26 | 24 | 26 | 306 |
| (44) class one | 24 | 23 | 27 | 26 | 25 | 23 | 24 | 19 | 25 | 8 | 24 | 26 | 274 |
| (52) copyist | 25 | 23 | 27 | 26 | 25 | 26 | 25 | 24 | 17 | 24 | 22 | 24 | 288 |

### 1887.

| | January. | February. | March. | April. | May. | June. | July. | August. | September. | October. | November. | December. | Total. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Days | 31 | 28 | | | | | | | | | | | 59 |
| Sundays | 5 | 4 | | | | | | | | | | | 9 |
| Holidays | 1 | 1 | | | | | | | | | | | 2 |
| Working days | 25 | 23 | | | | | | | | | | | 48 |
| (32) class four | 25 | 23 | | | | | | | | | | | 48 |
| (44) class one | 24 | 21 | | | | | | | | | | | 45 |
| (52) copyist | 25 | 23 | | | | | | | | | | | 48 |

## PARDON BUREAU.

DEPARTMENT OF JUSTICE,
*Washington, April —, 1887.*

SIR: The following statement of the method of transacting the business of the Pardon Bureau of this Department is respectfully submitted, in compliance with your request, for the information of the Select Committee of the Senate appointed in pursuance of a resolution adopted March 3, 1887, "to inquire into and examine the methods of business and work in the Executive Departments of the Government, &c.

Every application for pardon addressed to the President is referred to the Attorney-General, and by him to the clerk of pardons for his prompt and appropriate attention. Whereupon, in order to a proper consideration of the case, it becomes necessary for the clerk of pardons to inclose the application to the United States district attorney of the district in which the case occurred, for the purpose of obtaining a statement of the facts in the case and an expression of his opinion, and likewise, if practicable, that of the judge of the district upon the question of the exercise of Executive clem-

**22**                     THE DEPARTMENT OF JUSTICE.

ency in the premises, the following being the form of the circular letter in which the application is transmitted to the district attorney:

"DEPARTMENT OF JUSTICE,
"*Washington,* ——, 188-.

"SIR: The President has consulted the Attorney-General upon the application of —— —— for Executive clemency.

"The petition and other papers are herewith inclosed for your examination.

"You are directed to report as to the facts of the case; and also to express your opinion upon the expediency and justice of clemency in the premises. You will communicate, if practicable, with the judge who presided at the trial with a view of obtaining such expression of his opinion in the matter as he may be disposed to make, and transmit such opinion, if any is expressed, with your report.

"And please furnish an abstract of the docket entries, stating the precise offense, sentence, date of sentence, and court by which imposed.

"By direction of the Attorney-General,

"—— ——,
"*Clerk of Pardons.*

"—— inclosures, which please return.
"—— ——,
      "*United States Attorney,*
            "—— *District of* ——."

It is also usual to submit the case to the head of the Executive Department under whose jurisdiction it occurred, which is done not only in deference to the courtesy existing between the co-ordinate departments of the Government, but also for the purpose of eliciting such further facts and expression of official opinion as may thereby be obtained concerning the character of the case and the propriety of recommending the offender's pardon.

For example, if the case under consideration is a violation of the postal laws, a letter is prepared by the clerk of pardons for the Attorney-General to sign, which is sent to the Postmaster-General, and which is in the form following:

"DEPARTMENT OF JUSTICE,
"*Washington,* ——, 188-.

"SIR: You will please find inclosed certain papers relating to an application for the pardon of —— ——, who was convicted of a violation of the postal laws in the State of ——.

"I have the honor to request an expression of your opinion upon the propriety of granting his pardon.

"Very respectfully,

"—— ——,
"*Attorney-General.*

"The POSTMASTER-GENERAL."

When the necessary information has been obtained to enable the clerk of pardons to make up a proper presentation of the case he prepares his report upon it for submission to the Attorney-General. In doing this he mentions all the material facts to show the character of the offense and the circumstances connected with its commission, being careful at the same time to accord to the convict all that he may be fairly entitled to have said in his favor, so that the Attorney-General will have an impartial representation of the case in making up his mind as to the merits of the application. After the Attorney-General has done this, and indorsed the report with his recommendation for pardon or otherwise, it is sent to the President for his action upon it in the exercise of his constitutional prerogative. If it be the pleasure of the President to grant the pardon asked for, he signifies the same by an autographic memorandum upon the report and returns it to the Department of Justice, whereupon the clerk of pardons prepares for the Attorney-General to sign a requisition upon the Secretary of State for a warrant for pardon, giving the recital to be transcribed therein, the requisition being substantially after the following form:

"DEPARTMENT OF JUSTICE,
"*Washington,* ——, 188-.

"SIR: I am directed by the President to request you to issue a warrant for the pardon of —— ——, with the following recital:

"Whereas at the —— term, 188-, of the United States district court for the —— district of ——, —— —— was convicted on a charge of ——, and sentenced to —— years imprisonment in the penitentiary at ——;

" And whereas it appears that the said ——— ————, previous to the crime of which he was convicted, maintained a good character;

" And whereas it further appears that since his incarceration his health has become so impaired that the attending physician of the prison has certified that longer confinement will cost him his life;

" And whereas the United States district attorney and judge who officiated at his trial have recommend his pardon, which is asked for also by many respectable citizens: Now, therefore, &c.

" Very respectfully,

"————— ————,
" *Attorney-General.*

" The SECRETARY OF STATE."

The warrant for pardon having been prepared at the Department of State, is signed by the President, countersigned by the Secretary of State, and sent to the Department of Justice, when the clerk of pardons transmits it to its proper destination.

At every stage of these proceedings, in the progress of an application for pardon through the Department of Justice, a record is made in a book kept for that purpose, showing, in proper sequence, the name of the convict; the State and district where the case occurred; the nature of the crime; the sentence, and when imposed; the date when application for pardon was filed; when the case was referred to the district attorney; when district attorney's report was received; what the report was, favorable or unfavorable; when the case was reported to the Attorney-General; what his action was; when pardon was granted; when requisition was made on the Secretary of State; when the pardon was transmitted, and to whom.

Similar memoranda are also made on the jackets in which the papers in the case are filed for safe-keeping and future reference.

When the President declines to pardon, the parties are so informed, and the papers in that case filed away in the Department of Justice.

The time required for an application for pardon to get through the Department of Justice depends upon so many contingencies that it is difficult to state it with any degree of certainty. While, for instance, a district attorney to whom a case is referred may be able to report upon it within a week, because of his proximity to the seat of Government, &c., there are cases, sometimes, when the district attorney's residence is thousands of miles away; so that, by reason of that fact, or for mail interruptions, or because of his absence in attendance at court in a distant part of his district, and from other causes, he cannot be heard from for months. Consequently, action on said cases must be, in the mean time, suspended.

Then, too, it occasionally happens that the district attorney knows nothing of the case referred to him, because of its having occurred before the beginning of his term of service, and of the records not being immediately accessible to him.

While pardon cases are pending in the Department of Justice there is more or less correspondence concerning them, which, with personal interviews with regard to them, necessarily occupies much of the time of the clerk of pardons. Members of Congress who write or call to inquire as to the status of cases in which their constituents are interested; lawyers engaged as counsel in such cases; personal friends of the prisoners, and members of their immediate families, constitute the most of these correspondents and visitors. And when it is remembered that all of the duties of the bureau, as detailed in the foregoing statement, devolve upon a single person, it will readily be seen that some clerical assistance is required to aid him in their prompt performance, especially as applications for pardon are constantly increasing, notwithstanding the fact that during the last fiscal year fewer pardons were granted than during those immediately preceding it.

Respectfully submitted.

ALEX. R. BOTELER,
*Clerk of Pardons.*

The ATTORNEY-GENERAL.

---

## MISCELLANEOUS CASES DIVISION.

DEPARTMENT OF JUSTICE,
*Washington, D. C., March* 25, 1887.

SIR: In response to the circular of Hon. F. M. Cockrell, chairman Select Committee United States Senate, dated the 18th instant, a copy of which has been referred to me for consideration and report, I have the honor to call attention to the follow-

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **DANIEL LEWIS LEE** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No. 1:19-cv-03611-TSC** |
| | : | |
| **WILLIAM P. BARR, et al.** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

**<u>EXHIBIT 2</u>**

COPY



MAY 3

EXECUTIVE ORDER

I hereby direct that all warrants of pardon and commutation of sentences, heretofore prepared at the Department of State on the requisition of the Attorney General, be prepared and recorded in the Department of Justice under the seal of that Department and countersigned by the Attorney-General.

[Signed]  GROVER CLEVELAND.

Executive Mansion,

Washington, D. C., June 16, 1893.