IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


DANIEL LEWIS LEE                                    :
Register Number 21303-009                           :
U.S. Penitentiary Terre Haute                       :
Terre Haute, IN 47802                               :
                                                    :
          Plaintiff,                                :
                                                    :
          v.                                        :     Civil Action No. 1:19-cv-03611-TSC
                                                    :
WILLIAM P. BARR                                     :     CAPITAL CASE
Attorney General                                    :
U.S. Department of Justice                          :
950 Pennsylvania Avenue, NW                          :
Washington, DC 20530;                               :
                                                    :
JEFFREY A. ROSEN                                    :
Deputy Attorney General                             :
U.S. Department of Justice                          :
950 Pennsylvania Avenue, NW                          :
Washington, DC 20530;                               :
                                                    :
ROSALIND SARGENT-BURNS                             :
Acting Pardon Attorney                              :
Office of the Pardon Attorney                       :
950 Pennsylvania Avenue, NW                          :
Washington, DC 20530;                               :
                                                    :
KATHLEEN HAWK SAWYER                                :
Director                                            :
Federal Bureau of Prisons                           :
U.S. Department of Justice                          :
320 First St., NW                                   :
Washington, DC 20534;                               :
                                                    :
JEFFREY E. KRUEGER                                  :
Regional Director                                   :
Federal Bureau of Prisons                           :
North Central Region                                :
U.S. Department of Justice                          :

1

**400 State Avenue, Suite 800**                    :
**Kansas City, KS 66101;**                          :
                                                    :
**and**                                             :
                                                    :
**T.J. WATSON**                                     :
**Complex Warden**                                  :
**U.S. Penitentiary Terre Haute**                   :
**4700 Bureau Road South**                          :
**Terre Haute, IN 47802,**                          :
                                                    :
**In their official capacities; and,**              :
                                                    :
**U.S. Department of Justice**                      :
**950 Pennsylvania Avenue, NW**                     :
**Washington, DC 20530**                            :
                                                    :
**Federal Bureau of Prisons**                       :
**U.S. Department of Justice**                      :
**320 First St., NW**                               :
**Washington, DC 20534**                            :
                                                    :
**Office of the Pardon Attorney**                   :
**950 Pennsylvania Avenue, NW**                     :
**Washington, DC 20530;**                           :
                                                    :
            **Defendants.**                         :

## AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF THE FIRST AND FIFTH AMENDMENTS TO THE <u>UNITED STATES CONSTITUTION</u>

### I.
### <u>Nature of Action</u>

1.      Plaintiff Daniel Lewis Lee ("Mr. Lee") brings this action for injunctive and declaratory

relief for violations of: (i) his right to due process under the Fifth Amendment to the U.S.

Constitution, which have arisen in the course of his attempt to make use of mandatory

procedures created for individuals under a federal death sentence seeking executive clemency;

2

and (ii) the right to free speech under the First Amendment to the U.S. Constitution, on behalf of correctional officers who have been barred, due to Defendants' actions and policies, from providing critical information in the form of declarations or testimony in support of Mr. Lee's pending petition for executive clemency.

## II.
## Parties

2.      Plaintiff Lee is a U.S. citizen and he is incarcerated at the United States Penitentiary in Terre Haute, Indiana ("USP Terre Haute"). He is a death-sentenced prisoner under the control and supervision of the Federal Bureau of Prisons ("BOP"), an agency within the U.S. Department of Justice ("DOJ"). He was scheduled for execution by lethal injection at the United States Penitentiary in Terre Haute, Indiana on December 9, 2019. That execution has been was enjoined by this Court in a separate proceeding.[1]

3.      Defendant William P. Barr is the Attorney General of the United States. Mr. Lee was remanded into the Attorney General's custody upon Lee's conviction and the imposition of his death sentence. Attorney General Barr oversees the BOP and the Office of the Pardon Attorney.

---

[1] *See* Order Granting Motion for Preliminary Injunction, *In re In The Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-145, Dkt. 51 (D. D.C. Nov. 20, 2019). The Government appealed that decision to the United States Court of Appeals for the District of Columbia Circuit, indicating its intent to seek relief in the U.S. Supreme Court if a ruling was not entered by December 2, 2019. *See id.,* Dkt. 52; *see also,* Appellants' Emergency Motion to Stay or Vacate Preliminary Injunction, *In re In The Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-5322, Doc. 1817384 (D.C. Cir. Nov. 25, 2019). A panel of the Court of Appeals entered an order denying the Government's motion on December 2. *See* Order, *In re In The Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-5322, Doc. 1818236 (D.C. Cir. Dec. 2, 2019). It is counsel's understanding as of the time of this filing that the Government will be challenging the injunction in the Supreme Court imminently.

He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

4.      Defendant Jeffrey A. Rosen is the Deputy Attorney General of the United States. Under the supervision of the Attorney General, he oversees the day-to-day operations of the BOP and the Office of the Pardon Attorney. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

5.      Defendant Rosalind Sargent-Burns is the Acting Pardon Attorney. She is charged with managing the day-to-day operations of the Office of the Pardon Attorney, including oversight of the review and investigation of clemency petitions and making recommendations on petitions, pursuant to the clemency process, to the Deputy Attorney General and Attorney General. She is sued here in her official capacity for the purpose of obtaining declaratory and injunctive relief.

6.      Defendant Kathleen Hawk Sawyer is the Director of the BOP. She oversees the operations of BOP facilities, staff, and individuals in BOP custody, and serves the Deputy Attorney General and Attorney General. She is sued here in her official capacity for the purpose of obtaining declaratory and injunctive relief.

7.      Defendant Jeffrey E. Krueger is the Regional Director of the North Central Region of the BOP. As such, he has the responsibility for USP Terre Haute, and he plays a critical role in the oversight of the operations of that prison, including policy implementation. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

8.      Defendant T.J. Watson is the Complex Warden of USP Terre Haute, which is where Mr. Lee is confined. In that position, he is charged with management of USP Terre Haute and the oversight and implementation of operations and policies there. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

4

9.     Defendant DOJ is a cabinet-level department of the federal government responsible for enforcement of the laws of the United States, for oversight and implementation of procedures relating to executive clemency, and for oversight of the BOP and implementation of BOP policies.

10.    Defendant Office of the Pardon Attorney is an office within the DOJ responsible for reviewing, investigating, and making favorable or unfavorable recommendations regarding petitions for executive clemency.

11.    Defendant BOP is a sub-agency of the DOJ responsible for the care, custody, and control of individuals incarcerated by the Federal Government.

12.    Defendants are acting, and each of them at all times relevant hereto were acting, in their respective official capacities with respect to all acts described herein, and were in each instance acting under the color and authority of federal law in violating Mr. Lee's constitutional rights and the constitutional rights of BOP employees—USP Terre Haute correctional officers—seeking to provide critical information in the form of declarations or testimony in support of his clemency petition. Upon information and belief, unless preliminarily and permanently enjoined, each of the Defendants intends to act in his or her official capacity and under the authority of federal law in violating Mr. Lee's constitutional rights.

### III.
### Jurisdiction and Venue

13.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 2201 in that the claim for injunctive relief arises under the United States Constitution and federal statutes, including 5 U.S.C. § 702 which waives sovereign immunity for an action seeking relief other than monetary damages against an agency. The request for declaratory relief is based on 28 U.S.C. § 2201, in that an actual controversy exists between Defendants and Mr. Lee involving actions taken by the Defendants and policies applied by Defendants to Mr. Lee in violation of

5

rights guaranteed by the United States Constitution. Defendants have obstructed Mr. Lee's

ability to support his clemency petition with first-hand evidence from USP Terre Haute

corrections personnel, including that which powerfully and directly refutes false claims the

prosecution made in seeking a death sentence that he posed a continuing threat of violence in

prison.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1) because the

DOJ, Office of the Pardon Attorney, and BOP headquarters are in this district; because a

substantial part of the events giving rise to the claims made by Mr. Lee—including Defendants'

actions pertaining to the executive clemency process in Mr. Lee's case—took place and continue

to take place in this District; and because Defendants, the majority of whom reside in this

District, were acting in their official capacities in violating Mr. Lee's and the USP Terre Haute

correctional officers' constitutional rights.

**IV.**
**Factual Background**

A.     **Factual Allegations Pertaining to the Investigation and Preparation of Mr. Lee's**
       **Clemency Petition.**

15.     On July 25, 2019, Defendant DOJ and Defendant Attorney General Barr announced in a

press release that Plaintiff Lee had been selected to be executed by lethal injection pursuant to a

new protocol, and Defendant BOP was directed to set the date.[2] Mr. Lee was scheduled for

execution December 9, 2019, the first of five men to be executed in a span of five weeks, and the

---

[2] *See* Press Release, U.S. Department of Justice, Federal Government to Resume Capital
Punishment After Nearly Two Decade Lapse (July 25, 2019), available at
https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse (last visited Dec. 2, 2019 Feb. 12, 2020); *see also* Notice of Adoption of Revised
Protocol, *Roane v. Barr*, Civ. No. 05-2337,  (D. D.C. July 25, 2019), Dkt. 385 (notifying
plaintiffs in ongoing litigation challenging federal lethal injection protocol of revised protocol).

first federal execution in over sixteen years.[3] Although the execution date has passed in light of the Court's preliminary injunction, *see supra* ¶2, note 1, the Government has declared its intention to move forward with Mr. Lee's execution as long as no court order prohibits it.

16.    Upon receiving notification of the scheduled execution, counsel for Mr. Lee began to prepare for capital clemency proceedings on his behalf, and on August 30, 2019, Mr. Lee, consistent with the requirements of 28 C.F.R. § 1.10 ("Procedures Applicable to Prisoners Under a Sentence of Death Imposed by a United States Court"), filed a formal petition for commutation of his death sentence, addressed to the President of the United States, with the Office of the Pardon Attorney in the DOJ. *See* 28.C.F.R. §§ 1.1, 1.10(b).[4] Also consistent with these procedures, supplemental materials in support of the petition were submitted by September 13, 2019, and the Office of the Pardon Attorney scheduled an in-person meeting with Mr. Lee's counsel where evidence was presented on October 23, 2019. *Id.*

17.    Mr. Lee's petition for commutation of his death sentence is largely premised on two grounds. First, the victims' survivors, the judge who presided at trial and sentenced Mr. Lee to death, and the lead trial prosecutor, all oppose his execution—an extraordinary and rare, if not unprecedented, alignment of such views in a capital case. Second, the prosecution's misleading

---

[3] *Id.*

[4] On December 13, 2019, following the passing of his previously scheduled execution date, Mr. Lee withdrew the clemency application pending before the Office of the Pardon Attorney, in light of 28 C.F.R. § 1.10(e), which states: "Only one request for commutation of a death sentence will be processed to completion, absent a clear showing of exceptional circumstances." On December 16, 2019, the OPA responded by email, stating in relevant part: "In accordance with your client's request, we have administratively closed his clemency file without further action. If he decides to renew his application in the future, i.e., if another date of execution is set, he may submit a new application, or you may submit a new application on his behalf." Mr. Lee anticipates filing a new clemency application, in compliance with and pursuant to the procedures set forth in § 1.10, if and when a new execution date is set.

claim at the penalty phase of Mr. Lee's trial that he should be sentenced to death because he would otherwise pose a continuing threat of violent behavior in prison was then and remains today untrue; and that false and unreliable evidence about Mr. Lee posing a "future danger" led to a disparate, unjust outcome where he was sentenced to death but his far more culpable co-defendant Chevie Kehoe's life was spared.

18.     The prosecution's ~~misleading claims~~ misrepresentations about Mr. Lee's so-called "future dangerousness"—which provide the basis for this latter ground for clemency—were two-fold. First, it introduced false and inflammatory evidence that he was a "psychopath" as measured by a forensic instrument that has no place in a capital prosecution. The Government itself has quietly ceased using the instrument—Psychopathy Checklist-Revised (PCL-R)—to prove "future dangerousness" in capital cases.[5] Second, the prosecution suppressed information favorable to Mr. Lee and presented false ~~testimony~~ claims at his sentencing that he was responsible ~~about his prior involvement~~ as a youth for a prior ~~in a~~ murder in Oklahoma, for which he allegedly escaped culpability, in an effort to persuade jurors he fit the profile of a "psychopath" consistent with its PCL-R testing results and that he should not be spared again. Although the Government argued he was given a "gift" by the Oklahoma prosecutors ~~in the Oklahoma case~~ who let him ~~for letting him~~ get away with murder, the truth was that ~~in fact~~, they did not even have the option of charging him with a homicide; rather, the presiding judge

---

[5] Of the 62 people currently on federal death row, Mr. Lee is the *only one* whose capital sentencing proceedings relied on aggravating evidence of future dangerousness based on the PCL-R and so-called "psychopathy" evidence. *See* Federal Capital Habeas Project, *Growth in Federal Death Row Population*, available at https://2255.capdefnet.org/General-Statistics/Growth-Federal-Death-Row-Population (last visited ~~Dec. 2, 2019~~ Feb. 12, 2020) (showing total number of individuals on federal death row). In every other federal capital case involving such evidence, the courts have either been able to reverse the judgment or precluded the evidence from ever being presented to the jury in the first place.

determined that the evidence against him was legally insufficient to establish probable cause for murder.

19.     In support of this latter ground for clemency about the prosecution's misleading claims, Mr. Lee has submitted to the Office of the Pardon Attorney records from mental health providers who observed him as a youth, as well as declarations from individuals who knew him prior to his arrest in the capital proceeding, in an effort to debunk the bases for the alleged aggravating factor that Mr. Lee would be a future danger in prison; and he has provided a declaration from one of the jurors who sentenced him stating that although this juror was reluctant to believe Mr. Lee would pose a continuing threat of violence, the prosecution's presentation about him escaping culpability for the prior murder was important to the jury as a whole and ultimately swayed this juror's vote.

### 1.     The Material Evidence Mr. Lee Sought to Obtain

20.     As part of the preparation of his clemency petition, one of Mr. Lee's attorneys, George Kouros, communicated with a member of the correctional staff employed by Defendant BOP— an officer assigned for many years to the Special Confinement Unit (SCU),[6] where all men under federal death sentence are held—who has provided a detailed first-hand account; detailed information about subject matters, relating to Mr. Lee, learned in the course of his employment; and his own professional and personal opinions about Mr. Lee relating to the alleged "future dangerousness" aggravating factor, his character, and his behavior, among other issues. The correctional official provides important information and a unique perspective that—along with

---

[6] The Special Confinement Unit (SCU) at USP Terre Haute is, as its name suggests, a special unit designed for inmates with "maximum custody" classification and enhanced security measures implemented by specially trained staff.

the views of the victims' family members, trial judge, and trial prosecutor—strengthens his case

for commutation to life imprisonment without parole.having his sentence commuted. The

correctional official's account and opinions also powerfully and directly refute the claim that Mr.

Lee presents a continuing threat of violence. This information was based on the correctional

official's close interactions and communications with and daily observations of Mr. Lee in a

federal correctional institutional setting over a period of almost twenty years. He has further

indicated that several other USP Terre Haute staff members² are interested in providing similar

accounts, information, and opinions in support of Mr. Lee.

21.     The names of this correctional staff member and others are not disclosed in the

Complaint in order to protect their identities in light of expressed concerns about Defendants,

supervisors, and co-workers subjecting them to threats, reprisals, discipline, demotions,

unwanted transfers, and/or other potential job-related harms for providing any information in

support of Mr. Lee's application for commutation.

22.     Upon information and belief, it is rare and extraordinary for the correctional officers to

indicate an interest in supporting a federally death-sentenced inmate's application for

commutation, as they have in Mr. Lee's case. These officers have not come forward or been able

to give statements or testimony as private citizens in support of Mr. Lee because, upon

information and belief, they face official sanctions, including, for example, loss of pay and

possible termination, as well as unofficial consequences in the form of reprisals, such as being

transferred from highly sought-after SCU positions, for attempting to do so. Yet it is these

correctional officers who interact most closely and regularly with Mr. Lee and the other death-

sentenced inmates, and, who generally get know them best through those day-to-day contacts.

23.    The SCU itself is a distinct setting within the sprawling federal prison system, physically set apart from the rest of USP Terre Haute where more than 1,300 inmates are incarcerated.[7] It has a relatively small core group of specially trained correctional officers dedicated to the care and custody of the subset of 62 death-sentenced inmates and a few others in restrictive conditions of confinement who are held in the unit. Upon information and belief, although their official job duties are not publicly accessible, these officers are tasked with, among other things, delivering meals to SCU inmates three times a day, and escorting them individually back and forth between their cells for use of the law library and computer, for legal and social visits, and for indoor and outdoor recreational time.[8] These are some of the closest and most frequent interactions inmates like Mr. Lee have with other people in the SCU, and it is, in part, through these interactions that the correctional officers have become intimately familiar with Mr. Lee's background, history, and behavior in the SCU over an extended period. The correctional officers also are—because of these close interactions—called upon to evaluate death-sentenced inmates like Mr. Lee regularly. They, for example, evaluate an inmate's work performance—in Mr. Lee's case, as an orderly—assessing the inmate's job proficiency; the quality of his work; ability to work with others; response to supervision and instruction; need for supervision and dependability; ability, interest, and eagerness to learn; and initiative. Once such evaluations are conducted, the officers' on-the-ground assessment is routed to, and filtered through, supervising staff members with less frequent contacts with and personalized familiarity with the inmate—

---

[7] *See* https://www.bop.gov/locations/institutions/thp/ (last visited Feb. 6, 2020) (listing population as 1,329).

[8] The officers are also, for example, responsible for testing equipment, managing SCU recreation lists, and searching SCU cells for contraband. Upon information and belief, providing statements and/or testimony in connection with clemency proceedings is not part of the correctional officers' official job duties.

11

first to department heads, then the Unit Team, which consists of a counselor, case manager, and unit manager, for review.

24.    It is, as noted, in this environment, and this context, that the correctional officers have gotten to know Mr. Lee personally over many years, watched him grow and adapt to prison, and experienced first-hand his positive attributes; and it is their particularized knowledge of him drawn from interactions with and observations of him in that environment that so uniquely positions them to support his clemency application. Their personal views of him and their particularized knowledge of him as an individual, their personal and unique insights about him, developed through their close contacts with him, are broader and different from that which is reflected in their on-the-job evaluations of him. Because members of the Unit Team, the Associate Warden, and the Warden have contact with Mr. Lee that is far more limited than the interactions of the SCU officers discussed above, those officials' sanitized and potentially contradictory input is not a substitute.

25.    In August 2019, this the member of the SCU correctional staff at USP Terre Haute conveyed to who spoke directly with Mr. Kouros conveyed to him details about his experience with Lee that are critically important to the clemency application. He explained to Mr. Kouros that he had gotten to know Mr. Lee well over the many years he had worked in the SCU, that Mr. Lee was a model inmate, and that Mr. Lee had always treated him with respect. He further stated that while some inmates cause disciplinary problems and cannot be controlled easily, Mr. Lee was not among these in that he was easy to manage and never gave him problems. He added that people are capable of change in prison, that they can be educated and better themselves, and that Mr. Lee was a good example of that.

26.    This member of the USP Terre Haute SCU correctional staff explained to Mr. Kouros during the aforementioned communications that he was aware of how Mr. Lee had been portrayed in the media, as a violent white supremacist, and that this was not in fact an accurate portrayal. According to him, Mr. Lee was an easy inmate to supervise, was well-liked by other inmates and other staff in the SCU, and got along with everyone, including non-white prisoners and staff. He added that most people unfamiliar with prisons make assumptions that all inmates are dangerous and uncontrollable, but that he has a perspective on the SCU population that is based on actually having worked there for years and on getting to observe and interact with the inmates on a daily basis. He conveyed to Mr. Kouros that based on his experience, and on his knowing Mr. Lee for years, it was his opinion that Mr. Lee was not violent or dangerous, and that Mr. Lee was a "poster boy" for how an inmate could turn his life around in prison.

27.    This member of the SCU correctional staff further expressed during the aforementioned communications that Mr. Kouros should know that Mr. Lee had been given an orderly job in the SCU, and this said something in and of itself about how the correctional staff view Lee—he was trusted enough to be given that position because it meant periods of less restrictive conditions of confinement and supervision while performing his orderly job duties.

28.    This member of the SCU correctional staff further conveyed to Mr. Kouros during the aforementioned communications that in his experience, many of the men who go to prison do not come from stable homes and that the correctional officers who interact with them daily sometimes play a "father figure" or mentor role, teaching them how to grow and mature into men. He described Mr. Lee as "a man now" and that he accordingly treated the staff and other inmates with respect.

29.     Finally, this member of the SCU correctional staff informed Mr. Kouros during the aforementioned communications that he was aware of other staff members, including at least one ranking officer, who were interested in providing similar statements supporting Mr. Lee's clemency petition, but that he had been warned that the legal department had to first provide authorization for him and the others to provide such statements.

> **2.     Defendants' Deliberate Interference with Mr. Lee's Ability to Obtain and Present Material Evidence in the Clemency Process, and Infringement on Correctional Staff Members' Right to Provide Information in Support of his Clemency Application.**

30.     Following these communications, the same SCU correctional staff member in late August informed Mr. Lee's counsel that approval was required for him to provide a statement in connection with his clemency application. Mr. Lee's counsel then promptly contacted the USP Terre Haute legal department, in writing, requesting permission for members of the correctional staff to provide formal, sworn statements in support of Mr. Lee's petition for executive clemency. On September 6, 2019 an attorney from the legal department, Katherine Siereveld, by email informed Mr. Lee's counsel that in order to grant the request, she would have to "run this up the chain." On the same day, Mr. Lee's counsel wrote an email back to Ms. Siereveld, stressing the importance of a timely response on the request from the legal department, due to a then-fast approaching deadline for submission of materials to the Office of the Pardon Attorney in support of the clemency petition.

31.     On September 9, 2019 counsel for Mr. Lee sent another email to Ms. Siereveld seeking an answer regarding the request to collect statements from correctional staff. Ms. Siereveld responded that she had been attempting to see who could authorize the request and whether it could be authorized "outside of the official progress report[s]," stating the request may fall under BOP Program Statement 5840.04, which apparently requires authorization for staff to "release

official information or directly correspond with outside agencies or persons" about inmates' "background," "institutional behavior," or "progress." The same day, counsel for Mr. Lee followed up for clarity about what position BOP Ms. Siereveld was taking on the matter, and Ms. Siereveld she responded that she was still working on getting an answer.

32.    In response to a September 11, 2019 email from counsel for Mr. Lee seeking an update on the status of the request, Ms. Siereveld sent an email the following day, this time pointing to 28 C.F.R. § 571.41, a regulation pertaining to the BOP's sharing of general information with inmates about how to initiate the clemency process and the Office of the Pardon Attorney's procedures for obtaining recommendations from the Director of the BOP on clemency petitions, which was not relevant to Mr. Lee's interest in independently obtaining and presenting to the decision makers information and/or statements declarations or testimony from correctional staff in support of his clemency petition to decision makers. When Mr. Lee's counsel pressed for clarity on Defendant BOP's position regarding his request, Ms. Siereveld sent another email making clear that no staff member would be allowed to "offer opinions on Mr. Lee's clemency petition."

33.    Pursuant to 28 C.F.R. § 1.10(c), on October 23, 2019, at the Office of the Pardon Attorney, DOJ, in Washington D.C., counsel for Mr. Lee made a presentation and submitted evidence in support of his clemency petition to the presiding officials. During the proceeding, these officials, after making clear that they had reviewed parts of his trial record and BOP files, including his disciplinary records, asked counsel several pointed questions specifically about Mr. Lee's record at USP Terre Haute, his behavior there, his propensity for violence, with whom he associates, and his adjustment to prison and what kind of person he is today, among others. In response to the officials' questions, counsel for Mr. Lee explained that they did not have access

15

to much of the detailed information necessary to answer the questions posed, but felt strongly that, if they did, Mr. Lee would be reflected in a positive light.[9]

34.     Counsel were, as a result of Defendants' actions and policies, unable to present a full measure of support for Mr. Lee's petition in the clemency process—namely, ~~supporting declarations or other evidence~~ declarations or testimony from USP Terre Haute correctional personnel who know him personally and have interacted with him on a daily basis in a high security prison setting. These would have addressed what were clearly issues of serious concern for the officials about Mr. Lee's alleged "future dangerousness" as well as provided up-to-date information from Government sources about how Daniel Lee has changed in prison and who he actually is.

35.     Members of the USP Terre Haute correctional staff continue to possess highly relevant information that directly refutes the "future dangerousness" aggravator on which Mr. Lee's death sentence is based, and provides other facts contrary to representations made about him, but are being prevented from providing it in the clemency process. Because of Defendants' actions and policies, Mr. Lee is being deprived of his rights to meaningful access to that process, and the correctional staff who wish to share critical information, details, and opinions supporting him in that process are being deprived of their right to do so.

**B.     Factual Allegations Pertaining to the Process for Individuals Under Death Sentence.**

36.     The sole procedures for a person under a federal death sentence to petition the President of the United States for commutation are set forth in the Code of Federal Regulations, 28 C.F.R. § 1.1-1.10, with § 1.10 specifically governing the process petitioners must follow in capital

---

[9] Mr. Lee presents these questions and answers to the best of his recollection. Although the Office of the Pardon Attorney had a stenographer present, he was told that a transcript would be made for DOJ alone and that he would not have access to it despite his request.

cases. 28 C.F.R. § 1.10 was promulgated on August 2, 2000, in advance of what were then the first executions to be carried out by the Federal Government since the U.S. Supreme Court's decision in *Furman v. Georgia*, 92 S. Ct. 2726 (1972). The procedures applicable to persons under death sentence, among other requirements, set a strict deadline for the time for filing a clemency petition, and for submitting supplemental materials in support of the petition, to the Office of the Pardon Attorney in the DOJ; they describe the process—and only avenue—for the petitioner to present testimony and other materials in support of his petition to the Office of the Pardon Attorney, and the process—and only avenue—for the victims of an offense to provide their position on the petition. *See* 28 C.F.R. § 1.10.

37.     In addition to the mandatory procedures specifically applicable to persons under a death sentence seeking commutation, 28 C.F.R. §§ 1.1-1.11 set forth formal regulations that must be followed by anyone petitioning the President for relief in the form of executive clemency or pardon. Among them are regulations requiring submission of any petition for such relief to the Office of the Pardon Attorney, although petitions are to be addressed to the President, and requiring certain information be included in the petition; regulations describing the role of the Attorney General in investigating cases in which clemency relief is sought with assistance from agencies, such as the Federal Bureau of Investigations, in determining issues about disclosure of files and contacting victims, and in recommending favorable action by the President; regulations that permit the Attorney General to delegate duties related to the clemency process to others within DOJ, including the Office of the Pardon Attorney; and those that describe the process for notifications of grants and denials of petitions. *See* 28 C.F.R. § 1.1-1.11.

38.     The President's authority to grant pardons and reprieves and to commute sentences derives from Article II, Section 2, Clause 1[10] of the U.S. Constitution; however, mandatory procedures have been developed over the course of the last two centuries, in tandem with the growth of the administrative state, for petitioners, including members of the general public requesting pardon as well as prisoners in custody requesting commutation, to seek and potentially obtain such relief.

39.     In the early years of the Republic, the President relied directly on the advice of the Secretary of State and the Attorney General for reviewing petitions and exercising his pardon and clemency powers; by 1858, the review of petitions was transferred to the Attorney General while the issuing of warrants granting relief remained in the State Department's purview.[11] In 1865, Congress authorized the Attorney General to employ a pardon clerk to assist with the handling of petitions.[12]

40.     As the federal justice system grew in size and complexity, the U.S. Department of Justice was created, and the Office of Clerk of Pardons became part of it.[13] By 1887, the early iterations

---

[10] Article II, Section 2, Clause 1 in relevant part states: "The President…shall have power to grant reprieves and pardons for offenses against the United States except in cases of impeachment."

[11] *See* Homer Cummings & Carl McFarland, Federal Justice: Chapters in the History of Justice and the Federal Executive 149 (1937).

[12] *See* 13 Stat. 516 (authorizing Attorney General to employ one "pardon clerk").

[13]  *See* 16 Stat. 162 (establishing U.S. Department of Justice); *see also*, Records of the Office of the Pardon Attorney, National Archives (Record Group 204), 1846-1965 (noting "The Office of the Clerk of Pardons became a component of the newly created Department of Justice, pursuant to its enabling act, June 22, 1870 (16 Stat. 162), available at https://www.archives.gov/research/guide-fed-records/groups/204.html (last visited Dec. 2, 2019 Feb. 12, 2020).

of a more formal process for members of the public seeking pardon and those in custody seeking commutation to follow, and the rules for administrative officials to handle pardon and clemency petitions, began to take shape:  according to the "Pardon Bureau" in the DOJ's Report to a Select Committee of the Senate, dated April 1887, for example, "Every application for pardon addressed to the President is referred to the Attorney General, and by him to the clerk of pardons for his prompt and appropriate attention.;"[14] tThe Pardon Bureau further reported then that the Clerk of Pardons was directed to solicit the views of the U.S. Attorney and, if practicable, the views of the district judge, and to keep records of the progress of applications "at every stage of these proceedings," as part of the process for determining whether to make a favorable recommendation to the President.[15] At the time, the Clerk of Pardons, according to the same Report to the Senate, was overwhelmed by the growing number of petitions and the volume of duties placed upon him, especially in connection with his ability to manage correspondence with members of the public, and made clear to Congress the need for additional staff to assist him.[16]

41.      In 1891, the Office of the Clerk of Pardons was superseded by the Office of the Attorney in Charge of Pardons, established in the DOJ pursuant to an act of Congress;[17] and, in 1893, by Executive Order, the reviewing, investigating, and issuing of all warrants in connection with

---

[14] *See* Exhibit 1, Alex R. Boteler, Clerk of Pardons, Report of Pardon Bureau, U.S. Department of Justice Report to Select Committee of the Senate, April 1887.

[15] *Id.*

[16] *Id.*

[17] *See* 26 Stat. 946; *see also*, Records of the Office of the Pardon Attorney, National Archives (Record Group 204), 1846-1965, available at https://www.archives.gov/research/guide-fed-records/groups/204.html (last visited Dec. 2, 2019 Feb. 12, 2020).

19

petitions for commutation and pardons was consolidated within the DOJ.[18] The Office of the

Attorney in Charge of Pardons was redesignated the Office of the Pardon Attorney, as it is

known today, in 1894.[19]

42.    The first formal clemency rules[20] were approved by President McKinley in 1898 and

contained a few of the features of the modern day regulations pursuant to 28 C.F.R. § 1.1-1.11:

for example, the rules directed members of the public and those in custody applying for such

relief to address a petition to the President and forward it to the Attorney General; and, they set

out the process for soliciting views of the U.S. Attorney and trial judge, including in capital

cases, and the effect of those opinions on the Office of the Pardon Attorney's favorable treatment

of the petition.

43.    Between 1898 and 1962, the formal clemency rules underwent occasional revisions,

some of which appear in the modern day regulations—for example, the 1924 rules introduced the

designated form to be submitted by members of the public and those in custody; and were

adapted based on the expansion of the Republic,[21] and in light of the growing number of

---

[18] *See* Exhibit 2, Exec. Order (June 16, 1893) (stating "I hereby direct that all warrants of pardon and commutation of sentence, heretofore prepared at the Department of State on the requisition of the Attorney General, be prepared and recorded in the Department of Justice under the seal of that Department and countersigned by the Attorney-General").

[19] *See* Records of the Office of the Pardon Attorney, National Archives (Record Group 204), 1846-1965, available at https://www.archives.gov/research/guide-fed-records/groups/204.html (last visited Dec. 2, 2019 Feb. 12, 2020).

[20] Upon information and belief, the various versions of the formal clemency rules prior to their formal publication in the Federal Register are on file with the U.S. Department of Justice.

[21] *See* "Rules Relating to Application for Pardon," Department of Justice, Feb. 12, 1924 (noting special rules for petitioners from "Puerto Rico, Hawaii, Virgin Islands, and the Canal Zone…").

individuals incarcerated in federal prisons or on parole,[22] or those subject to prosecution under federal "Immigration, Narcotic, Naturalization, Postal, or Prohibition Laws."[23] The Federal Bureau of Investigations was first assigned a formal role in investigating the "record and conduct" of petitioners in 1946.[24]

44.     In 1962, the "Rules Governing Petitions for Executive Clemency" took on their modern day form and structure, and were for the first time formally published for the public in the Federal Register, which contains agency rules, proposed rules, public notices, administrative orders, and executive orders: "These regulations shall become effective on the thirty-first day following the date of their publication in the Federal Register."[25] The 1962 regulations remained in place until 1983, when two additions to the regulations were made and published in the Federal Register, 28 C.F.R. §§ 1.1-1.10;[26] and they were amended in 1993 to include a provision for notifying individuals under death sentence about the disposition of their petitions.[27]

---

[22] *See id.* (noting "Applications for Executive clemency will not be considered until after the person convicted has served some portion of his sentence (nor ordinarily, until the prisoner has reached his parole period and been denied parole) except upon a substantial showing of innocence or some other exceptional circumstance, developed since the trial, which clearly justifies an extension of Executive clemency."); *see also,* 46 Stat. 325 (pursuant to 1930 Act of Congress, Bureau of Prisons was established within DOJ).

[23] *See id.*

[24] *See* "Rules Governing Petitions for Executive Clemency," Department of Justice, Jan. 19, 1946; *see also* 28 C.F.R. § 1.6(a).

[25] *See* "Rules Governing Petitions for Executive Clemency," Department of Justice, Oct. 30, 1962.

[26] *See* "Rules Governing Petitions for Executive Clemency," Department of Justice, May 5, 1983.

[27] *See* "Rules Governing Petitions for Executive Clemency," Department of Justice, Oct. 12, 1993.

45.    As noted previously, the regulations setting forth special procedures applicable to petitioners under federal death sentence like Mr. Lee, codified at § 1.10, went into effect in August 2000 and remain in place today.

46.    What was once an informal, ad hoc undertaking involving the President and a few of his closest advisors has developed into a modern day system operating with the hallmarks of the administrative state—duties related to the handling, investigation, and consideration of clemency petitions, for example, have by and large been delegated to career officials in the Office of the Pardon Attorney and other agencies within the DOJ bureaucracy, situated well downstream from the President; and formal agency regulations have been promulgated for the general public and these administrative officials to follow. Countless persons seeking justice through the different forms of clemency relief, including those potentially eligible for pardon, the almost two hundred thousand in federal custody,[28] and the sixty-two under federal death sentence,[29] who have no direct line to the President, are by legislative and executive branch design steered to and dependent on this firmly rooted administrative system.

47.    It is against this backdrop that Mr. Lee ~~has sought to utilize the formal procedures specifically developed for prisoners under a death sentence to pursue executive clemency,~~ facing what he and other stakeholders in his case believe is an unjust execution, ~~Mr. Lee~~ has turned to the traditional "'fail safe' in our criminal justice system." *Herrera v. Collins*, 113 S. Ct. 853, 868 (1993). In order to obtain such relief, he has no choice but to rely on the mandatory clemency

---

[28] *See* U.S. DEP'T OF JUSTICE, OFFICE OF JUSTICE PROGRAMS, BUREAU OF JUSTICE STATISTICS, PRISONERS IN 2017 (April 2019), available at https://www.bjs.gov/content/pub/pdf/p17.pdf (last visited ~~Dec. 2, 2019~~ Feb. 12, 2020).

[29] Federal Capital Habeas Project, *Growth in Federal Death Row Population*, available at https://2255.capdefnet.org/General-Statistics/Growth-Federal-Death-Row-Population (last visited ~~Dec. 2, 2019~~ Feb. 12, 2020)

process that the Government itself has created for review and consideration of clemency petitions for individuals under sentence of death. He has sought to follow the requirements, adhere to the deadlines, and utilize the procedures made available to him, pursuant to the regulations formally published for the public and prisoners alike, and those that apply in particular to capital cases; but ~~It is~~ in the course of attempting to follow the requirements of this process—for seeking, through the Office of the Pardon Attorney, a favorable recommendation on his petition to the President—he has encountered 1) the Defendants' obstruction of his ability to gather and present critical, material evidence, which refutes the case against him and exposes the lie on which his death sentence is based; and, 2) the Defendants' infringement on the correctional officers' ability to support his efforts in that process. He has no adequate remedy at law for these constitutional violations. And both he and those officers uniquely positioned to support him will suffer irreparable injury unless appropriate equitable relief is provided by the Court.

**V.**
**Claims for Relief**

A. **Deprivation of Fifth Amendment Right to Due Process—Defendants' Deliberate Interference with Mr. Lee's Ability to Obtain and Present Material Evidence from BOP Correctional Officers in Support of his ~~Pending~~ Petition for Clemency.**

48. Mr. Lee re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

49. The Due Process Clause of the Fifth Amendment prohibits the Government from deliberately interfering with a witness's ability to speak with the representatives of a criminal defendant. *See, e.g., Gregory v. United States*, 369 F.2d 185, 187-89 (D.C. Cir. 1966). These protections afforded to Mr. Lee extend beyond the trial proceeding. *See, e.g., Blackledge v. Perry*, 417 U.S. 21 (1974) (due process prohibits prosecutorial retaliation for defendant's decision to seek retrial). Importantly, the protections of the Due Process Clause apply to capital

23

clemency proceedings like Mr. Lee's, and the Government is prohibited from arbitrarily or perniciously denying a death-sentenced prisoner access to its clemency process. *See Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 288-89 (1988) (O'Connor, J., concurring); *see also, Young v. Hayes*, 218 F.3d 850, 853 (8th Cir. 2000) (granting stay of execution and remanding case with looming execution date in light of state actor's deliberate interference with petitioner's ability to present evidence to Governor in support of clemency petition, which violated Due Process protections).

50.     Defendants' actions and policies obstructing Mr. Lee's ability to gather and present favorable, material evidence from USP Terre Haute correctional staff members which directly refutes his alleged "future dangerousness" have deprived him of a meaningful opportunity to utilize procedures that he must comply with to pursue executive clemency relief. As demonstrated by the questions posed to Mr. Lee's counsel by officials in the Office of the Pardon Attorney—officials tasked with reviewing, investigating and deciding whether to make a favorable recommendation on his petition—falsehoods about his propensity for violence both matter to key decision-makers in the clemency process and persist unchallenged as a direct result of Defendants' deliberate interference in that process.

51.     These actions and policies have further interfered with Mr. Lee's ability to gather and present other evidence highly relevant to his petition for commutation.

52.     By the actions and policies described above, the Defendants have violated and deprived Mr. Lee of his constitutional right to due process of law, as guaranteed by the Fifth Amendment.

53.     If Mr. Lee's execution is carried out without his having been provided a fair and unobstructed clemency process, he will, without question, have been deprived of the due process to which he is entitled.

54. An actual controversy exists between the parties regarding Defendants' actions and policies obstructing Mr. Lee's ability to gather and present favorable, material evidence from correctional officers, and a resolution by the Court will guide the parties' legal relations. Mr. Lee also lacks adequate remedies at law to address Defendants' violations,. Accordingly, Mr. Lee and seeks appropriate declaratory relief and injunctive relief restraining Defendants from continuing to violate his due process rights as alleged herein.

**B.      Deprivation of Fifth Amendment Right to Due Process—Defendants' Actions and Policies Stripped Mr. Lee of the Basic Procedural Safeguards He is Entitled to in Capital Clemency Proceedings.**

55. Mr. Lee re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

56. The Due Process Clause of the Fifth Amendment guarantees that Mr. Lee be afforded basic procedural safeguards in clemency proceedings, where the Government has created specific procedures for petitioners to utilize in seeking clemency. *See Woodard*, 523 U.S. at 288-89 (O'Connor, J., concurring); *see also, Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (where government creates discretionary system for jurors, defendant has liberty interest in exercise of that discretion); *see also Young*, 218 F.3d at 853.

57. Mr. Lee, like the death-sentenced petitioner in *Young*, has attempted to utilize the clemency process that the Government itself has created for review and consideration of clemency petitions, and has encountered Defendants' interference in that process preventing him from obtaining and presenting critical evidence in support of his petition for commutation. *See id.* (noting such "conduct on the part of a state official is fundamentally unfair. It unconscionably interferes with a process that the State itself has created. The Constitution of the United States does not require that a state have a clemency procedure, but, in our view, it does require that, if

25

such a procedure is created, the state's own officials refrain from frustrating it by threatening the job of a witness").

58.     By the actions and policies described above, the Defendants have violated and deprived Mr. Lee of his constitutional right to due process of law, as guaranteed by the Fifth Amendment.

59.     If Mr. Lee's execution is carried out without his having been provided a fair and unobstructed clemency process, he will, without question, have been deprived the due process to which he is entitled.

60.     An actual controversy exists between the parties regarding Defendants' actions and policies obstructing Mr. Lee's ability to gather and present favorable, material evidence from correctional officers, and a resolution by the Court will guide the parties' legal relations. Mr. Lee also lacks adequate remedies at law to address Defendants' violations,. Accordingly, Mr. Lee and seeks appropriate declaratory relief and injunctive relief restraining Defendants from continuing to violate his due process rights as alleged herein.

**C.      Deprivation of First Amendment Rights to Free Speech—Defendants' Actions and Policies Prohibit USP Terre Haute Correctional Staff Members from Exercising Their Rights to Provide Information in Support of Mr. Lee's Petition for Executive Clemency.**

61.     Mr. Lee re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

62.     Mr. Lee meets the criteria for third party standing to bring this action under the Free Speech Clause of the First Amendment on behalf of USP Terre Haute correctional staff who wish to provide statements in support of his clemency petition but who have been barred from doing so due to Defendants' actions and policies. *See Powers v. Ohio*, 499 U.S. 400, 409-412 (1991) (criminal defendants have standing to assert the interests of minority jurors improperly removed by the state both because of the practical difficulties in expecting jurors to litigate the

26

matter themselves, and because defendants' stake in the outcome of the proceeding assures they will litigate the claim aggressively); *see also Shimer v. Washington*, 100 F.3d 506, 508-09 (7th Cir. 1996) (clemency petitioners may assert First Amendment violations on behalf of prison guards where the guards have indicated their willingness to write on petitioner's behalf but refrained from doing so in light of restrictive prison policy). Mr. Lee has a concrete interest in this litigation, He seeks clemency relief, which for him is a matter of life or death. as tThe prohibition on correctional staff members' ability to provide information in the form of declarations or testimony in support of him in the clemency process "will affect him adversely," and may "hinder the flow of information—a procedural defect which may act to his detriment." *Id.* at 508. The information the correctional staff members wish to share is "particularly pertinent," as it is they "who have daily contact with [Mr. Lee] and therefore can realistically assess his person." *Id.* The information they wish to provide, moreover, has enhanced importance because it refutes false and inflammatory allegations about his purported "future dangerousness." Mr. Lee's interest in presenting declarations or testimony from the correctional officers is identical and closely aligned with the officers' interest in expressing their support for him. And, in light of those inter-connected interests, Mr. Lee will serve as a zealous advocate on behalf of the officers, who face grave obstacles—loss of pay, discipline, demotions, unwanted transfers, and possible termination among them—for pursuing this lawsuit on their own behalf, essentially chilling their speech.

63.    Public employees, like the The USP Terre Haute correctional officers wish to provide material information in support of Mr. Lee's clemency petition in their capacity as private citizens. As noted previously, providing such information in support of a death-sentenced clemency petitioner, is, upon information and belief, not ordinarily within the scope of the

27

officers' job duties. While their declarations or testimony may concern information acquired by virtue of their employment, there is no reason or expectation that the speech at issue would need to be given on the job or in uniform. Simply put, they wish to express their personal support for Mr. Lee, someone they have gotten to know well, in the clemency process. That is a personal and private choice they are making, and it is involves speech protected under the First Amendment. Public employees, like the officers, who wish to provide material information in support of Mr. Lee's clemency petition in their capacity as private citizens, have a constitutionally protected interest in freedom of speech that cannot be suppressed under threat of reprisal, discipline, or discharge. *See e.g., Lane v. Franks,* 573 U.S. 228, 239-40 (2014); *Garcetti v. Ceballos,* 126 S.Ct. 1951, 1958 (2006) ("The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens"); *Pickering v. Board of Education*, 391 U.S. 563, 574 (1968) (noting that "it is apparent that the threat of dismissal from public employment is…a potent means of inhibiting speech.").

64.    The USP Terre Haute corrections officers' prohibited speech addresses a matter of public concern, as it relates to the Government wielding its awesome power to execute Mr. Lee and to do so despite grave constitutional violations and serious allegations of official misconduct. The Government chose to highly publicize its intent to execute Mr. Lee, *see supra* note 2, and since then the issue of whether he, and others, should be executed has garnered a great deal of the public's attention.[30] The circumstances of Mr. Lee's execution, including his clemency bid and

---

[30] Upon information and belief, over 500 original opinion and original news stories were published from July 25, 2019, when DOJ announced their intent to execute Mr. Lee and others, through January 31, 2020, about the federal government restarting executions. That number does not include the dozens of instances where those original pieces were picked up by other sources, i.e., *Associated Press*, *Reuters*, and other news media, and reprinted on multiple websites and

the inequities in his case, have also drawn significant attention in the public sphere.[31] ~~and their~~

~~The correctional officers'~~ ability to speak as citizens to administrative officials involved in the

exercise of the clemency power—the traditional "'fail safe' in our criminal justice system,"

*Herrera v. Collins*, 113 S.Ct. 853, 868 (1993)—and expose the truth about Mr. Lee's good

character and behavior in prison, outweighs the interest of their employer "in promoting

efficiency of the public services it performs through its employees." *Pickering v. Board of*

*Education*, 391 U.S. 563, 568 (1968); *see also Connick v. Myers*, 461 U.S. 138, 147-48 (1983);

*Garcetti*, 126 S.Ct. at 1956-59; *Eberhardt v. O'Malley*, 17 F.3d 1023, 1026 (7th Cir. 1994) ("The

greater the potential social, as distinct from purely private, significance of the employee's speech,

the less likely is the employer to be justified in seeking to punish or suppress it."). Notably,

courts around the country have recognized that statements on equally or less pressing matters

occupy "the highest rung of hierarchy of First Amendment values." *Connick*, 461 U.S. at 145;

*see Barnard v. Jackson County, Mo.*, 43 F.3d 1218, 1225 (8th Cir.), *cert denied*, 516 U.S. 808

(1995) (collecting cases); *see, e.g., Buzek v. County of Saunders*, 972 F.2d 992, 995 (8th Cir.

---

newspapers. In addition, a bi-partisan group of three hundred relatives of murder victims, current and former law enforcement officials and former judges signed letters urging the Administration to refrain from pursuing the executions, and effort that was highly publicized. *See, e.g.,* Mark Berman, "Hundreds of Victims' Relatives, Ex-officials Ask Trump Administration to Halt Federal Executions," https://www.washingtonpost.com/national/hundreds-of-victims-relatives-current-and-former-officials-ask-trump-administration-to-halt-federal-executions/2019/11/12/90cede54-04cd-11ea-8292-c46ee8cb3dce_story.html (last visited Feb. 12, 2020).

[31] *See, e.g.,* Campbell Robertson, "She Doesn't Want Her Daughter's Killer to Be Put To Death. Should the Government Listen?," https://www.nytimes.com/2019/10/29/us/arkansas-federal-death-penalty.html (last visited Feb. 12, 2020).

1992) (letter written voluntarily by police officer on defendant's behalf at sentencing was a matter of public concern).

65.     By the actions and policies described above, and through their deliberate interference with Mr. Lee's ability to obtain and present favorable, material evidence from USP Terre Haute correctional staff in the capital clemency process, including that which refutes his alleged "future dangerousness," the Defendants have violated and deprived these correctional staff of their First Amendment rights. As a result of Defendants' actions and policies, these correctional staff members, should they choose to exercise their right to speak out and provide critical information in support of Mr. Lee, are potentially subject to threat of reprisal, discipline, or discharge, and/or other potential job-related harms, thereby effectively chilling their protected speech. *See Shimer*, 100 F.3d at 508.

66.     If Mr. Lee's execution is allowed to proceed before the USP Terre Haute correctional officers who wish to provide such information to support him in the clemency process have the opportunity to do so, the exercise of their free speech rights in this context will be meaningless and completely nullified.

67.     An actual controversy exists between the parties regarding Defendants' suppression of correctional officers' free speech rights under the First Amendment, in connection with Mr. Lee's capital clemency process. Mr. Lee also lacks adequate remedies at law to address Defendants' violations. Accordingly, Mr. Lee and seeks appropriate declaratory relief and injunctive relief restraining Defendants from continuing to violate the correctional officers' free speech rights as alleged herein.

## IV.
## Prayer for Relief

Wherefore, Mr. Lee prays for relief as follows:

1) Exercise jurisdiction over this action;

2) Issue appropriate declaratory and injunctive relief to stop the constitutional violations described above and to ensure that Defendants' are enjoined from interfering with USP Terre Haute correctional staff members speaking or writing on behalf of Mr. Lee's clemency petition, and to ensure that Mr. Lee is able to obtain and present ~~statements~~ declarations or testimony from USP Terre Haute correctional staff unencumbered by Defendants' obstruction in the executive clemency process;

3) Enjoin Defendants from carrying out Mr. Lee's scheduled execution—if the injunction currently in place in this Court is lifted ~~in the challenge to the Government's execution protocol~~—so that he may utilize the clemency process unencumbered by the Defendants' violation of his rights under the Fifth Amendment and the violation of the rights of USP Terre Haute correctional staff who wish to ~~provide information and/or statements~~ support~~ing~~ him in the clemency process under the First Amendment; and

4) Grant such other relief as this Court deems just and proper.

Respectfully submitted,

~~/s/ Ruth Friedman~~

~~Ruth Friedman~~
~~Federal Capital Habeas Project~~
~~Federal Defender for the District of Maryland~~
~~6411 Ivy Lane, Suite 710~~
~~Greenbelt, MD 20770~~
~~(301) 344-0600~~
~~Ruth_Friedman@fd.org~~

31

/s/ John Nidiry
John Nidiry
Federal Capital Habeas Project
Federal Defender for the District of Maryland
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 807-1267
John_Nidiry@fd.org

/s/ David Victorson
David Victorson
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-5600
david.victorson@hoganlovells.com

/s/ Pieter Van Tol
Pieter Van Tol
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 909-0661
pieter.vantol@hoganlovells.com

Counsel for Daniel Lee

Dated: February 12, 2020

32

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **DANIEL LEWIS LEE** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No. 1:19-cv-03611-TSC** |
| | : | |
| **WILLIAM P. BARR, et al.** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

**EXHIBIT 1**

## THE DEPARTMENT OF JUSTICE.    **21**

The following table shows the number of days devoted to business by the employés of the division of appointments and disbursements:

### 1884.

| | January. | February. | March. | April. | May. | June. | July. | August. | September. | October. | November. | December. | Total. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Days .............. | 31 | 29 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 | 366 |
| Sundays........... | 4 | 4 | 5 | 4 | 4 | 5 | 4 | 5 | 4 | 4 | 5 | 4 | 52 |
| Holidays ......... | 1 | 1 | .... | .... | 1 | .... | 1 | .... | .... | .... | 1 | 1 | 6 |
| Working days..... | 26 | 24 | 26 | 26 | 26 | 25 | 26 | 26 | 26 | 27 | 24 | 26 | 308 |
| (32) class four .... | 26 | 24 | 26 | 26 | 26 | 25 | 26 | 21 | 26 | 27 | 24 | 26 | 303 |
| (44) class one . .... | 26 | 24 | 26 | 26 | 26 | 22 | 24 | 26 | 24 | 25 | 8 | 21 | 278 |

### 1885.

| | January. | February. | March. | April. | May. | June. | July. | August. | September. | October. | November. | December. | Total. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Days .............. | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 | 365 |
| Sundays........... | 4 | 4 | 5 | 4 | 5 | 4 | 4 | 5 | 4 | 4 | 5 | 4 | 52 |
| Holidays ......... | 1 | 1 | .... | .... | 1 | 2 | .... | .... | .... | .... | 2 | 1 | 8 |
| Working days..... | 26 | 23 | 26 | 26 | 25 | 20 | 25 | 26 | 26 | 27 | 23 | 26 | 305 |
| (32) class four..... | 26 | 23 | 26 | 26 | 25 | 26 | 25 | 22 | 26 | 27 | 23 | 26 | 301 |
| (44) class one ..... | 26 | 23 | 26 | 26 | 24 | 25 | 22½ | 26 | 26 | 7 | 23 | 25 | 270½ |
| (52) copyist* ...... | .... | .... | .... | .... | .... | .... | 17 | 26 | 26 | 27 | 23 | 25 | 144 |

\* Appointed July 9, 1886.

### 1886.

| | January. | February. | March. | April. | May. | June. | July. | August. | September. | October. | November. | December. | Total. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Days .............. | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 | 565 |
| Sundays........... | 5 | 4 | 4 | 4 | 5 | 4 | 4 | 5 | 4 | 5 | 4 | 4 | 52 |
| Holidays ......... | 1 | 1 | .... | .... | 1 | .... | 1 | .... | .... | .... | 2 | 1 | 7 |
| Working days..... | 25 | 23 | 27 | 26 | 25 | 26 | 26 | 26 | 26 | 26 | 24 | 26 | 306 |
| (34) class four ..... | 25 | 23 | 27 | 26 | 25 | 26 | 26 | 26 | 26 | 26 | 24 | 26 | 306 |
| (44) class one ..... | 24 | 23 | 27 | 26 | 25 | 23 | 24 | 19 | 25 | 8 | 24 | 26 | 274 |
| (52) copyist. ...... | 25 | 23 | 27 | 26 | 25 | 26 | 25 | 24 | 17 | 24 | 22 | 24 | 288 |

### 1887.

| | January. | February. | March. | April. | May. | June. | July. | August. | September. | October. | November. | December. | Total. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Days .............. | 31 | 28 | .... | .... | .... | .... | .... | .... | .... | .... | .... | .... | 59 |
| Sundays........... | 5 | 4 | .... | .... | .... | .... | .... | .... | .... | .... | .... | .... | 9 |
| Holidays .......... | 1 | 1 | .... | .... | .... | .... | .... | .... | .... | .... | .... | .... | 2 |
| Working days..... | 25 | 23 | .... | .... | .... | .... | .... | .... | .... | .... | .... | .... | 48 |
| (32) class four...... | 25 | 23 | .... | .... | .... | .... | .... | .... | .... | .... | .... | .... | 48 |
| (44) class one ..... | 24 | 21 | .... | .... | .... | .... | .... | .... | .... | .... | .... | .... | 45 |
| (52) copyist . ....... | 25 | 23 | .... | .... | .... | .... | .... | .... | .... | .... | .... | .... | 48 |

## PARDON BUREAU.

DEPARTMENT OF JUSTICE,
*Washington, April —, 1887.*

SIR: The following statement of the method of transacting the business of the Pardon Bureau of this Department is respectfully submitted, in compliance with your request, for the information of the Select Committee of the Senate appointed in pursuance of a resolution adopted March 3, 1887, "to inquire into and examine the methods of business and work in the Executive Departments of the Government, &c.

Every application for pardon addressed to the President is referred to the Attorney-General, and by him to the clerk of pardons for his prompt and appropriate attention. Whereupon, in order to a proper consideration of the case, it becomes necessary for he clerk of pardons to inclose the application to the United States district attorney of the district in which the case occurred, for the purpose of obtaining a statement of the facts in the case and an expression of his opinion, and likewise, if practicable, that of the judge of the district upon the question of the exercise of Executive clem-

**22**                    THE DEPARTMENT OF JUSTICE.

ency in the premises, the following being the form of the circular letter in which the application is transmitted to the district attorney:

"DEPARTMENT OF JUSTICE,
"*Washington*, ———, 188-.

"SIR: The President has consulted the Attorney-General upon the application of ——— ——— for Executive clemency.

"The petition and other papers are herewith inclosed for your examination.

"You are directed to report as to the facts of the case; and also to express your opinion upon the expediency and justice of clemency in the premises. You will communicate, if practicable, with the judge who presided at the trial with a view of obtaining such expression of his opinion in the matter as he may be disposed to make, and transmit such opinion, if any is expressed, with your report.

"And please furnish an abstract of the docket entries, stating the precise offense, sentence, date of sentence, and court by which imposed.

"By direction of the Attorney-General,

"——— ———,
"*Clerk of Pardons.*

"——— inclosures, which please return.
"——— ———,
       "*United States Attorney*,
            "——— *District of* ———."

It is also usual to submit the case to the head of the Executive Department under whose jurisdiction it occurred, which is done not only in deference to the courtesy existing between the co-ordinate departments of the Government, but also for the purpose of eliciting such further facts and expression of official opinion as may thereby be obtained concerning the character of the case and the propriety of recommending the offender's pardon.

For example, if the case under consideration is a violation of the postal laws, a letter is prepared by the clerk of pardons for the Attorney-General to sign, which is sent to the Postmaster-General, and which is in the form following:

"DEPARTMENT OF JUSTICE,
"*Washington*, ———, 188-.

"SIR: You will please find inclosed certain papers relating to an application for the pardon of — ———, who was convicted of a violation of the postal laws in the State of ———.

"I have the honor to request an expression of your opinion upon the propriety of granting his pardon.

"Very respectfully,

"——— ———,
"*Attorney-General.*

"The POSTMASTER-GENERAL."

When the necessary information has been obtained to enable the clerk of pardons to make up a proper presentation of the case he prepares his report upon it for submission to the Attorney-General. In doing this he mentions all the material facts to show the character of the offense and the circumstances connected with its commission, being careful at the same time to accord to the convict all that he may be fairly entitled to have said in his favor, so that the Attorney-General will have an impartial representation of the case in making up his mind as to the merits of the application. After the Attorney-General has done this, and indorsed the report with his recommendation for pardon or otherwise, it is sent to the President for his action upon it in the exercise of his constitutional prerogative. If it be the pleasure of the President to grant the pardon asked for, he signifies the same by an autographic memorandum upon the report and returns it to the Department of Justice, whereupon the clerk of pardons prepares for the Attorney-General to sign a requisition upon the Secretary of State for a warrant for pardon, giving the recital to be transcribed therein, the requisition being substantially after the following form:

"DEPARTMENT OF JUSTICE,
"*Washington*, ———, 188-.

"SIR: I am directed by the President to request you to issue a warrant for the pardon of ——— ———, with the following recital:

"Whereas at the ——— term, 188-, of the United States district court for the ——— district of ———, ——— ——— was convicted on a charge of ———, and sentenced to ——— years imprisonment in the penitentiary at ———;

"And whereas it appears that the said ——— ———, previous to the crime of which he was convicted, maintained a good character;

"And whereas it further appears that since his incarceration his health has become so impaired that the attending physician of the prison has certified that longer confinement will cost him his life;

"And whereas the United States district attorney and judge who officiated at his trial have recommend his pardon, which is asked for also by many respectable citizens: Now, therefore, &c.

"Very respectfully,

"——— ———,
"*Attorney-General.*

"The SECRETARY OF STATE."

The warrant for pardon having been prepared at the Department of State, is signed by the President, countersigned by the Secretary of State, and sent to the Department of Justice, when the clerk of pardons transmits it to its proper destination.

At every stage of these proceedings, in the progress of an application for pardon through the Department of Justice, a record is made in a book kept for that purpose, showing, in proper sequence, the name of the convict; the State and district where the case occurred; the nature of the crime; the sentence, and when imposed; the date when application for pardon was filed; when the case was referred to the district attorney; when district attorney's report was received; what the report was, favorable or unfavorable; when the case was reported to the Attorney-General; what his action was; when pardon was granted; when requisition was made on the Secretary of State; when the pardon was transmitted, and to whom.

Similar memoranda are also made on the jackets in which the papers in the case are filed for safe-keeping and future reference.

When the President declines to pardon, the parties are so informed, and the papers in that case filed away in the Department of Justice.

The time required for an application for pardon to get through the Department of Justice depends upon so many contingencies that it is difficult to state it with any degree of certainty. While, for instance, a district attorney to whom a case is referred may be able to report upon it within a week, because of his proximity to the seat of Government, &c., there are cases, sometimes, when the district attorney's residence is thousands of miles away; so that, by reason of that fact, or for mail interruptions, or because of his absence in attendance at court in a distant part of his district, and from other causes, he cannot be heard from for months. Consequently, action on said cases must be, in the mean time, suspended.

Then, too, it occasionally happens that the district attorney knows nothing of the case referred to him, because of its having occurred before the beginning of his term of service, and of the records not being immediately accessible to him.

While pardon cases are pending in the Department of Justice there is more or less correspondence concerning them, which, with personal interviews with regard to them, necessarily occupies much of the time of the clerk of pardons. Members of Congress who write or call to inquire as to the status of cases in which their constituents are interested; lawyers engaged as counsel in such cases; personal friends of the prisoners, and members of their immediate families, constitute the most of these correspondents and visitors. And when it is remembered that all of the duties of the bureau, as detailed in the foregoing statement, devolve upon a single person, it will readily be seen that some clerical assistance is required to aid him in their prompt performance, especially as applications for pardon are constantly increasing, notwithstanding the fact that during the last fiscal year fewer pardons were granted than during those immediately preceding it.

Respectfully submitted.

ALEX. R. BOTELER,
*Clerk of Pardons.*

The ATTORNEY-GENERAL.

---

## MISCELLANEOUS CASES DIVISION.

DEPARTMENT OF JUSTICE,
*Washington, D. C., March 25, 1887.*

SIR: In response to the circular of Hon. F. M. Cockrell, chairman Select Committee United States Senate, dated the 18th instant, a copy of which has been referred to me for consideration and report, I have the honor to call attention to the follow-

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


| | | |
|---|---|---|
| **DANIEL LEWIS LEE** | **:** | |
| | **:** | |
| **Plaintiff,** | **:** | |
| | **:** | |
| **v.** | **:** | **Civil Action No. 1:19-cv-03611-TSC** |
| | **:** | |
| **WILLIAM P. BARR, et al.** | **:** | |
| | **:** | |
| | **:** | |
| **Defendants.** | **:** | |


**<u>EXHIBIT 2</u>**

COPY



EXECUTIVE ORDER

I hereby direct that all warrants of pardon and commutation of sentences, heretofore prepared at the Department of State on the requisition of the Attorney General, be prepared and recorded in the Department of Justice under the seal of that Department and countersigned by the Attorney-General.

[Signed] GROVER CLEVELAND.

Executive Mansion,

Washington, D. C., June 16, 1893.